571 F.2d 514
 78-1 USTC P 9220
 The WESTERN CASUALTY AND SURETY COMPANY, Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee,
American Insurance Association, American Mutual Insurance
Alliance, and National Association of Independent
Insurers, Amici Curiae.
 No. 76-1631.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted Sept. 30, 1977.
Decided Jan. 31, 1978.
Rehearing Denied March 13, 1978.
 
 Reece A. Gardner of Stinson, Mag, Thomson, McEvers & Frizzell, Kansas City, Mo., for petitioner-appellant.
 Richard W. Perkins, Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., and Gilbert E. Andrews, Tax Div., Dept. of Justice, Washington, D. C., on the brief), for respondent-appellee.
 John S. Breckinridge, Jr. of Everett, Johnson & Breckinridge, New York City (K. Martin Worthy and Arthur Peter, Jr. of Hamel, Park, McCabe & Saunders, Washington, D. C., Charles W. Davis, Frederic W. Hickman and Richard Bromley of Hopkins, Sutter, Mulroy, Davis & Cromartie, Chicago, Ill., on the brief), for amici curiae.
 Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 We here review a decision of the Tax Court which upheld in part the Commissioner's determination of deficiencies in the Western Casualty and Surety Company's income tax for the taxable years 1967, 1968 and 1969. The basic issue is one of income tax law as it pertains to a fire and casualty insurance company. We must determine whether the petitioner was entitled to include as deductions commissions on deferred premium installments, in the computation of "expenses incurred," as defined in § 832(b)(6). The second issue must be considered only if it is ruled that the Commissioner was correct in denying deductions on deferred premium installments. That is concerned with how the taxpayer's income is to be adjusted so as to reflect the change of accounting method required by the Tax Court's determination on the first issue. There is little or no dispute as to the facts. Western is a stock fire and casualty company organized under the laws of Kansas.
 
 
 2
 It is petitioner's custom to issue insurance policies covering a period of more than 12 months from the effective date of the policy. The duration of these is generally three years or five years. The insured has an option to pay only the premium for the first year of coverage, and he may pay the premium installment for each succeeding year of coverage on the anniversary date of the insurance or he may allow the policy to lapse by not paying the premium. Western also has one year policies under which the premium may be paid in installments within the policy year. This policy lapses also if there is a failure to pay an installment. The portion of the premium which is not paid at the outset is called "deferred premium installments."
 
 
 3
 In its annual statement an insurance company is required to report its annual premiums on policies in force and its gross and net premiums. The company may include deferred premium installments either as they become due or as if they were in fact prepaid. Western has chosen the latter method, that is has included its deferred premium installments as if they had been prepaid. Each year it establishes a reserve for unearned premiums and the deferred premium installments are included. Commissions are paid to salesmen both currently and in ensuing years only if actual payment is made of the premium by the insured. However, the total amount of commissions for the entire term which are anticipated to be payable are charged to reserves for commissions at the time a policy is written. These reserves are reduced as the commissions are actually paid.
 
 
 4
 As noted above, Western pays commissions to its agents according to the premiums actually paid by the policyholder. Under the policies with respect to which there are deferred premium installments, the total of the agent's commission which will be payable if the policy is continued in force for its entire life is added to its reserve for commissions at the time of writing. This reserve is reduced as the commissions are paid.
 
 
 5
 In the years in question Western added the amounts of the reserves for commissions to the commissions actually paid and deducted the entire sum. The Commissioner determined that since Western had not been obligated to pay the commissions until premiums were actually paid and inasmuch as the policyholders were not obligated to pay premiums, the deduction of the whole amount, that actually paid and that which was treated as reserve, constituted an overstatement of deductions to the extent that it included unpaid commissions on deferred premium installments. It is this action of the Commissioner, which was affirmed by the Tax Court, which is the first issue on this appeal.
 
 
 6
 The Tax Court pointed out that § 1.446-1(c)(1)(ii) of the regulations provides that a deduction under the accrual method of accounting is not allowable for a taxable year unless all events have occurred which establish the fact of liability giving rise to such deduction.
 
 
 7
 The Tax Court rejected the contention of Western that its receipt of deferred premium installments was to be regarded as merely a matter of collection since the obligation to pay the premium had not arisen. It reasoned that since the policyholders are not obligated to pay premiums and since there is no legal right on the part of Western to collect its payment of related commission, it is not to be considered merely contingent on collection. The Tax Court relied on the last sentence of § 832(b)(6), which provides that the deductions are to be reduced by expenses incurred which are not allowable as deductions by subsection (c).
 
 I.
 
 8
 DID THE TAX COURT ERR IN RULING THAT TAXPAYER WAS NOT
 
 
 9
 ENTITLED TO INCLUDE AS DEDUCTIONS SALES COMMISSIONS ON
 
 
 10
 DEFERRED PREMIUM INSTALLMENTS AND THAT SUCH COMMISSIONS CAN
 
 
 11
 BE DEDUCTED ONLY IN THE YEAR PAID?
 
 
 12
 The applicable taxing statute is I.R.C. § 832. Part (b) deals with income, and subsection (b)(6) defines "expenses incurred." The deductions are provided for in § 832(c). The part of that section which is relevant is § 832(c)(1), allowing deduction of "all ordinary and necessary expenses incurred, as provided in section 162 (relating to trade or business expenses)."
 
 
 13
 Section 832(b)(6) defines the term "expenses incurred" as meaning all expenses shown on the annual statement approved by the National Association of Insurance Commissioners. It goes on to say that these are to be computed as follows: "To all expenses paid during the taxable year, add expenses unpaid at the end of the taxable year and deduct expenses unpaid at the end of the preceding taxable year." It goes on to provide that "there shall be deducted from expenses incurred all expenses incurred (as defined in this paragraph) which are not allowed as deductions by subsection (c)."
 
 
 14
 The taxpayer contends that the commissions shown on the statement of the NAIC are deductible because of the fact that they are shown on the annual statement approved by the NAIC in the initial year of the policy. However, the Tax Court rejected this argument, relying on the last sentence of § 832(b)(6), just referred to, which prohibits deduction of all expenses incurred which are not allowed as deductions by subsection (c). The position that the Tax Court thus took was that the obligation of the taxpayer to pay commissions is not fixed until the premium installment is paid. Because of this, under normal § 162 standards the commission could not be considered an accrued expense and deducted immediately even by an accrual method taxpayer. Since § 832(c) incorporates expressly § 162, including its standards, the Commissioner's position and that of the Tax Court are in accordance with the applicable provisions of the Code. The taxpayer's contention is that the reference to § 162 is to the type of commissions and not to the timing of the deduction. Thus, there is a conflict. On the one hand, the item of deduction does appear on the statement just as § 832(b)(6) requires. One question is whether this of itself gives it the character of a deduction.
 
 
 15
 In addition, the Tax Court reasoned that since deferred premiums were not included in income in the year that the policy was sold, under § 832(b)(3)-(4), the result is that the deductions fail to match up with the related income, the premiums. Consequently, the taxpayer's method of accounting fails to reflect income from which the commission can be deducted. We are in full agreement with the Tax Court's conclusions and reasons.
 
 
 16
 Finally, we must reject Western's position that the "expenses incurred," which term appears in § 832(b)(6), are deductible if shown in the annual statement in accordance with NAIC regulation. The consequence of this, according to Western's further argument, is that the presence of unpaid commissions on the annual statement form is itself enough to render them exempt from the requirements or standards of § 162, so that they can be deducted without more. The further consequence of this argument is that in the case of a conflict between the NAIC statement form and a provision of the Code, § 162, the latter is to be ignored or construed as meaning only those expenses that are not shown on the annual statement and are to be tested against subsection (c). The effect of this latter approach is subversion of § 162. Also, this would lead (as was pointed out in the Tax Court's opinion) to an anomalous result. It would mean that anything appearing in the report would be free of being disallowed under § 162 whether it is in agreement with the relevant Act of Congress or not. This we cannot accept.
 
 
 17
 In 8 J. Mertens, The Law of Federal Income Taxation § 44.55 (1970), it is stated that § 832(b)(6) is to be read in connection with § 832(c) "which further defines the deductions which insurance companies of this class may take." Id. at 221. The latter provision lists the deductions allowable to an insurance company. The Mertens analysis, which construes § 832(b)(6) with § 832(c) for the present purposes, is followed by the Tax Court in this case. In this connection it is to be concluded from the last sentence of § 832(b)(6) and § 832(c)(1), that the NAIC forms are not absolute and that where they conflict with the ordinary requirements of § 162, the latter prevails.
 
 
 18
 The position of the Commissioner and of the Tax Court is supported by Commissioner v. General Reinsurance Corp., 190 F.2d 148 (2d Cir.), cert. dismissed, 342 U.S. 863, 72 S.Ct. 111, 96 L.Ed. 649 (1951). In that case the court was construing § 204(b)(1) of the 1939 Internal Revenue Code, which was identical in pertinent part to the present § 832(b)(1) and which required gross income to be "computed on the basis of the underwriting and investment exhibit of the annual statement of proof by the National Convention (now Association) of Insurance Commissioners." The court there said in pertinent part as follows:
 
 
 19
 This is what we think Congress intended, that is, to require the taxpayers to report their true net income for taxation, allowing them to take the "Convention Form" as their "basis" for computation. But in so far as that computation excluded factors, like the unauthorized unearned premium and loss reserves here involved, which the statutory methods of reporting income in subdivisions (5) and (6) did not exclude, we think that the specific provisions of the statute are controlling.
 
 
 20
 190 F.2d at 151. Thus, the case holds that where there is a conflict between the National Convention of Insurance Commissioners, now National Association, and the revenue statute, the latter controls.
 
 
 21
 To the same effect is Commissioner v. United States Guarantee Co., 190 F.2d 152 (2d Cir. 1951).
 
 
 22
 The decision of the Tax Court is also in general accord with the requirement of symmetry of income and expenditure entries, which is prescribed in Commissioner v. Standard Life & Accident Insurance Co., 433 U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977).
 
 
 23
 We must conclude that the Commissioner and the Tax Court were correct in holding that the relevant statutes prevail and were in conflict with the NAIC. Deference to the NAIC would allow the deduction of commissions which had not been actually paid or incurred and were mere accounting entries.
 
 II.
 
 24
 WHETHER THE COMMISSIONER AND TAX COURT ERRED IN HOLDING THAT
 
 
 25
 IMPROPER DEDUCTIONS TAKEN BY THE TAXPAYER PRIOR TO 1967
 
 
 26
 COULD BE CORRECTED BY MAKING AN ADJUSTMENT IN TAXPAYER'S
 
 
 27
 1967 INCOME PURSUANT TO I.R.C. § 481(a).
 
 
 28
 In Part I of this opinion we have upheld the determination that petitioner-appellant is allowed to deduct sales commissions applicable to deferred premium installments only in the year in which such commissions are actually paid. We must now consider the extent to which the Commissioner is authorized to correct the improper deductions which were made by taxpayer prior to 1967.
 
 
 29
 The Commissioner included in taxpayer's 1967 income an adjustment amounting to $6,404,442. He did so pursuant to § 481(a) of the I.R.C., which provides that if the taxpayer computes his income under a method of accounting different from the method under which the taxable income for the preceding taxable year was computed there shall be taken into account, in the year of the change, those adjustments necessary to prevent the duplication or omission of amounts of gross income or deductions.[1]
 
 
 30
 The amount of the adjustment found by the Commissioner was $6,527,381. This was the amount of the reserve for unpaid commissions as of December 31, 1966. The net figure, $6,404,442, reflected a deduction of $122,939 for policies sold prior to 1954, the date of the enactment of the adjustment statute. The taxpayer also deducts this figure in compliance with the "except" clause of § 481(a). Taxpayer does not dispute the fact that an adjustment is necessary to comply with § 481(a). The difference between it and the Commissioner is a sizable amount. The taxpayer argues that it should be $5,059,297 rather than the Commissioner's amount, $6,404,442. Thus, the dispute involves a.$1,345,145 difference. The controversy turns on the interpretation of § 481(a).
 
 
 31
 The taxpayer's first argument is that since it was not yet known in 1967 (the taxable year for which § 481 requires an adjustment) how much of the remainder of the reserves would ultimately have to be paid out as commissions, it was unknown whether any duplication of deductions would occur.
 
 
 32
 Taxpayer acknowledges that some adjustment must be made; that it is required by § 481(a) due to the change of accounting method.[2]
 
 
 33
 There can be no dispute as to the need for adjustment for commissions previously deducted which were actually paid in 1967, because under the modified system of accounting such expenditures are deductible in 1967. Therefore, adjustment is essential in order to prevent duplication of the deduction. By the same token, the balance of the taxpayer's December 31, 1966 reserves will result in duplicated deductions in later years if they are actually paid (i.e. if the premium installments are paid by the policyholders). If, of course, the premium installments are not paid, no duplication will occur since no future deduction will be allowable under the new method of accounting.
 
 
 34
 The commissions which have been deducted previously (in the year the policies have been sold), but which will never be paid, will result in an omission from the taxpayer's income. Under taxpayer's former method of accounting these commissions were deducted from reserves for unpaid commissions in the year when it was determined that they would not have to be paid. This constituted a correction of taxable income in that year. Under the new method of accounting the reserve is not taken into account in computing the deduction for commissions. The result is that commission expenses that have been improperly deducted in prior years, which would have been corrected under the old method of accounting, will not be corrected under the new method. These result in an omission from income "solely by reason of the change" in accounting method within § 481, whereby an adjustment under that provision must be made.
 
 
 35
 Taxpayer contends that under any method of accounting the commissions previously deducted would have to be added to income in the year that it is determined that they will not have to be paid. This is the so-called "tax benefit rule." See, e.g., Commissioner v. Anders, 414 F.2d 1283 (10th Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 423 (1969); Southwestern Illinois Coal Corp. v. United States, 491 F.2d 1337, 1339 (7th Cir. 1974); 1 J. Mertens, The Law of Federal Income Taxation § 7.34, at 111 (1974). However, the Commissioner need not wait for this eventuality. Inasmuch as the omission results solely from the change in accounting method, § 481 requires that the adjustment be made in 1967, the year of the change.
 
 
 36
 Moreover, the taxpayer's first argument would prevent a § 481 adjustment from being made in any case in which the Commissioner disallows the accrual of an item of deduction under the "all events" test;[3] the application of that test always implies a possibility that the deduction in a future year will never occur. This would severely limit the applicability of § 481 and would defeat its basic purpose of preventing a distortion of taxable income and a windfall to the taxpayer as a result of change in accounting method at a time when the statute of limitations is a bar to a reopening of the taxpayer's early returns. See Graff Chevrolet Co. v. Campbell, 343 F.2d 568, 572 (5th Cir. 1965). Thus, § 481 has been invoked where deductions for accrued expenses have been allowed under the "all events" test. See Shepherd Construction Co., 51 T.C. 890, 898-99 (1969).
 
 
 37
 Taxpayer's second argument is that § 481 requires an adjustment only for items that would be omitted or duplicated during the year of the change of accounting method. This would give the taxpayer a double deduction for commissions paid in 1968 or later on policies sold before 1967. This would eventuate simply because the second deduction of the item would occur after the year of the change. Section 481 does provide any adjustment to be made to the taxpayer's income for the year of the change; except as otherwise permitted by § 481(b), it states no limitation on the "amounts being duplicated or omitted" for which adjustment is required. To impose such a limitation would be at odds with the intent of Congress to prevent items of income and expense from being reported more than once or omitted entirely. See H.R. Rep. No. 1337, 83d Cong., 2d Sess., reprinted in (1954) U.S. Code Cong. & Admin. News pp. 4017, 4076, 4303; S. Rep. No. 1622, 83d Cong., 2d Sess., reprinted in (1954) U.S. Code Cong. & Admin. News pp. 4621, 4696, 4947.
 
 
 38
 Both the Senate and House Reports have examples which reflect the intent that § 481 adjustments are to be used to prevent duplication or omissions in taxable years after the year of the change. See H.R. Rep. No. 1337, 83d Cong., 2d Sess., reprinted in (1954) U.S. Code Cong. & Admin. News pp. 4017, 4303-04; S. Rep. No. 1622, 83d Cong., 2d Sess., reprinted in (1954) U.S. Code Cong. & Admin. News pp. 4621, 4948-49. See also Treas. Reg. § 1.481-2(d), example (1) (1974).
 
 
 39
 There are no cases which expressly consider the taxpayer's contention. There are authorities, however, which give approval to the Commissioner's making § 481 adjustments despite the fact that the duplication or omission might not occur for many years after the year of the change in the accounting method. Such a case is Adolph Coors Co. v. Commissioner, 519 F.2d 1280, 1284 (10th Cir. 1975), cert. denied, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). Certain costs relative to construction were deducted as incurred. We held that the items had to be capitalized. To prevent double deduction, a § 481 adjustment was necessary, notwithstanding that the duplication would spread out over a long period. Accord, Electric & Neon, Inc., 56 T.C. 1324 (1971), aff'd without opinion, 496 F.2d 876 (5th Cir. 1974).
 
 
 40
 The position of the Commissioner has been consistent that when a change of accounting method postpones the deductibility of an expense item, the § 481 adjustment is in the amount of the full balance of whatever account on the taxpayer's books represents the amount of deductions already taken that will be duplicated at any time in the future less any pre-1954 adjustment. See, e.g., Rev.Rul. 71-137, 1971-1 C.B. 104; Rev.Rul. 67-379, 1967-2 C.B. 127. See generally Treas. Reg. § 1.481-1(c)(1) (1960).
 
 
 41
 The § 481 adjustment procedure is capable of imposing a substantial burden on the taxpayer in that it may involve the necessity of paying in the year of the change in accounting method expenses covering many taxable years. It is to be emphasized, however, that the large sum represents improper deductions which would otherwise result in omission from income. Section 481 has the effect of accelerating the ultimate taxation of omitted income from an unascertainable date in the future to the year of the change. See Note, Problems Arising From Changes in Tax-Accounting Methods, 73 Harv.L.Rev. 1564, 1576-77 (1960). Congress was cognizant of the probable burdens resulting from liquidating the amount of the adjustment in one year. This is apparent from provisions made for alleviating this burden in certain cases. See I.R.C. § 481(b)(1)-(2). The taxpayer here has not sought to use any such method.
 
 
 42
 The third issue which was before the Tax Court involved the deduction of losses under § 832. On this the ruling was for the taxpayer. The Commissioner has not appealed this ruling.
 
 
 43
 The judgment of the Tax Court is affirmed.
 
 BARRETT, Circuit Judge, dissenting:
 
 44
 I respectfully dissent.
 
 
 45
 As required by law, Western filed in Kansas (just as such companies must in each state they are authorized to do business) the "Annual Statement" of financial condition and the results of operations for the reporting years on forms prescribed by and in accordance with the instructions of the National Association of Insurance Commissioners (NAIC), formerly known as the National Convention of Insurance Commissioners. The "Annual Statement" forms consist of detailed financial accounting under general headings of (a) Assets, (b) Liabilities, Surplus and Other Funds, and (c) Underwriting and Investment Exhibit. The "Annual Statement" is used by various state regulatory agencies or departments as the basis for examination. The instructions for the forms issued by the NAIC permit insurers to use either of two methods to report premiums payable in installment upon policies of insurance which grant the insured the option to pay the stated premium in installments. Some policies were issued for a one-year term, others for three-year terms and, in a few cases, some for five-year terms.
 
 
 46
 In each calendar year commencing 1954 and continuing through 1969, some of the single-year insurance policies issued by Western provided that the policyholder could pay the premium in installments during the policy year. If the policyholder had elected not to pay the premium when an installment became due, the policy simply lapsed. Those premiums over a policy term which need not be paid, at the option of the policyholder, are referred to as "deferred premium installments."
 
 
 47
 Under the instruction forms issued by NAIC dating back to 1954 relating to property and casualty companies, Western chose to report the "deferred premium installments" as "premiums written." When reported in that manner, the NAIC instructions required that all commissions payable to agents relating to those premiums be included as expenses in the underwriting. Thus, for federal income tax purposes consistent with the requirements of the NAIC in relation to its reporting instructions Western reported as "premiums written" the total premium provided for in the policy which, of course, included installments which became due beyond the then federal income tax calendar reporting year. The unpaid premiums were the "deferred premium installments." When the deferred premiums are thus reported, the NAIC required Western to include the entire amount of commissions payable to its agents relating to those premiums (for the life term of the policy) in its Annual Statement as expenses in underwriting and investments.
 
 
 48
 In Western's Annual Statement for calendar years 1967, 1968 and 1969, it booked deferred premium installments when the policies were issued and included the installments in unearned premiums as of the end of the year. Western charged unpaid commissions for the deferred premium installments as expenses of the year in which the policies were issued. Western's auditors certified that this practice was "in conformity with insurance accounting principles prescribed or permitted under statutory authority," and that the resulting net income reported in the statements was " . . . in conformity with generally accepted accounting principles." During the three taxable years, Western included deferred premium installments in its respective federal income tax returns in the gross premiums written during the year and in reserves for unearned premiums on outstanding business at the end of the year, and the commission expenses were deducted.
 
 
 49
 IRS allowed Western a deduction representing the amount of the commissions actually paid during the taxable year. This increased Western's taxable income by $266,946 for the year 1967 and $311,217 for the year 1968. It decreased Western's taxable income $241,086 for the year 1969. The amount of these adjustments is the difference between the commissions paid during the year and the commission expense deducted by the taxpayers for the year. The adjustment also represents the difference between the taxpayers' reserve for commissions on deferred premium installments at the end of the taxable year and that reserve at the end of the preceding year.
 
 
 50
 I agree with Western's contention that the Tax Court erred in sustaining the IRS position that Western is required, for the taxable years in issue, to change its method of accounting for commissions on deferred premium installments. Western argues that it is entitled to a current (taxable year) deduction, as ordinary and necessary business expenses, for projected future payments of commissions to agents on policies which provide for payment of the premiums in installments.
 
 
 51
 IRS argues that well-settled tax accounting principles prohibit a deduction of projected commissions prior to the period in which the taxpayer must pay them. Furthermore, IRS contends that nothing in 26 U.S.C.A. §§ 832(b)(6) and (c)(1), infra, authorize the exception urged by Western. § 832(c)(1), supra, allows as deductions "all ordinary and necessary expenses incurred, as provided in section 162 (relating to trade or business expenses) . . . ." § 162, 26 U.S.C.A. simply provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including certain itemized expenses and identifying those which are not to be allowed.
 
 
 52
 The Tax Court held that Congress intended by § 832(b)(6), supra, that no deduction from underwriting income for an expense incurred was to be allowed unless such deduction would also be allowable under subsection (c), supra, and that a deduction for unpaid commissions on deferred premium installments would not be allowable deductions under § 162, supra, since all of the events necessary to establish the fact of liability giving rise to such deductions had not occurred during the taxable year in which the deductions were claimed. The same proposition is well stated by the IRS: "In other words, the claimed expense must qualify as a deduction under Section 162, without regard for Subsection (b)(6) of Section 832; if it qualifies under Section 162 . . . and is 'shown on the annual statement,' . . . the expense is deducted as an expense incurred in determining underwriting income under Subsection (b)(3) and, through underwriting income, gross income under Subsection (b)(1)." (Brief of Appellee, p. 22.)
 
 
 53
 Western counters the above IRS contentions and Tax Court holdings on the basis that if an item is of a type allowed as a deduction under § 162, supra, it is then deductible for the year in which it is shown on the Annual Statement. In support thereof, Western argues that it is the intent of Subsection (b)(6) in every instance to defer to the method of accounting of the Annual Statement in determining when such item is deductible. I agree.
 
 Section 832(c)(1) provides:
 
 54
 (c) Deductions allowed. In computing the taxable income of an insurance company subject to the tax imposed by section 831, there shall be allowed as deductions:
 
 
 55
 (1) all ordinary and necessary expenses incurred, as provided in section 162 (relating to trade or business expenses);
 
 Section 832(b)(6) provides:
 
 56
 (b) Definitions. In case of an insurance company subject to the tax imposed by section 831
 
 
 57
 (6) Expenses incurred. The term "expenses incurred" means all expenses shown on the annual statement approved by the National Convention of Insurance Commissioners, and shall be computed as follows: To all expenses paid during the taxable year, add expenses unpaid at the end of the taxable year and deduct expenses unpaid at the end of the preceding taxable year. For the purpose of computing the taxable income subject to the tax imposed by section 831, there shall be deducted from expenses incurred (as defined in this paragraph) all expenses incurred which are not allowed as deductions by subsection (c). (Emphasis supplied.)When these two sections are considered together, it seems clear to me that an insurance company may deduct "all ordinary and necessary expenses incurred" as provided in Section 162 under § 832(c)(1) and that under § 832(b)(6) "expenses incurred" is specifically defined to include all expenses shown on the Annual Statement approved by the National Convention of Insurance Commissioners, now NAIC. In Commissioner of Internal Revenue v. Standard Life & Accident Co., No. 75-1771, 433 U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653, 1977, the United States Supreme Court held that the Internal Revenue Code of 1954 requires computations of a life insurance company's income taxes "in a manner consistent with the manner required for purposes of the annual statement approval by the National Association of Insurance Commissioners" unless the NAIC procedures are inconsistent with accrual accounting rules which require different treatment under the Code. On page 161 of 433 U.S. on page 2531 of 97 S.Ct. supra, the Court, after noting that the accounting approach adopted by the NAIC for purposes of preparing the Annual Statement is firmly anchored to § 818(a) of the Code which establishes a preference for NAIC accounting methods, stated in footnote 24, to-wit:
 
 
 58
 Evidence of congressional respect of NAIC accounting methods is not limited to the portion of the Code concerning life insurance companies. In defining "gross income" and "expenses incurred" for purposes of taxing certain other insurance companies, Congress expressly requires computations to follow "the annual statement approved by the National Convention of Insurance Commissioners." 26 U.S.C. § 832(b)(1)(A), (b)(6).
 
 
 59
 No. 75-1771, p. 161, 97 S.Ct. p. 2531.
 
 
 60
 A similar holding was rendered by the full Tax Court in Bituminous Casualty Corp. v. Commissioner, 57 T.C. 58 (1971), wherein the Court opined:
 
 
 61
 From the inception of the income tax in 1913 until 1921 insurance company income was computed for tax purposes under rules relating to corporations generally. In 1921, however, that system was recognized to be inappropriate and special rules were adopted. There had evolved in the insurance industry prior to 1921 a uniform format for reporting casualty company income. That format had been devised and developed by the insurance commissioners in the various States acting through an association then known as the National Convention of Insurance Commissioners and now known as the National Association of Insurance Commissioners, or sometimes simply as the NAIC. Thus, when the casualty insurance provisions were adopted in 1921, the statute specifically provided that income would be computed on the basis of "the underwriting and investment exhibit" approved by the National Convention of Insurance Commissioners. The substance of that exhibit, although modified and rearranged in some details, has remained essentially the same from 1921 to present time.
 
 
 62
 The Annual Statement method of accounting relies extensively on the use of estimated amounts which would be improper under general tax accounting. Thus, for example, instead of taking into income all of the premiums received or accrued, casualty insurance companies take into account only the portion of those premiums which are estimated to be "earned." Similarly, the major deductions from income are "losses" and "loss adjustment expenses," which are again estimated amounts. The deduction of these loss and loss adjustment expense items is fundamentally at odds with the "all events" test: The items include amounts for liabilities which are not established, but, on the contrary, vigorously contested; they include, in the case of the loss adjustment items, expenses which will not only be paid in the future, but which are attributable to events which will not even occur until the future, including future overhead ; and they are so unsusceptible of accurate estimate that Internal Revenue Service rules applicable in certain contexts provide that estimates will be considered in aggregate amounts rather than individually and will not be disturbed if, over a period of years, they are on the average within 15 percent of the final figure.
 
 
 63
 Petitioners herein do not contend that the Annual Statement method of accounting is controlling in every respect for tax purposes. However, the Internal Revenue Code clearly adopts the basic approach of the Annual Statement method in computing underwriting income and that basic approach, so far as it concerns income from premiums and losses from claims, is inconsistent with tax accrual rules applicable to commerce generally. (Emphasis supplied.)
 
 
 64
 57 T.C., at pp. 77, 78.
 
 
 65
 In Bituminous the Tax Court concluded that the usual principles of tax accounting must give way to the Congressionally preferred NAIC accounting system. The logic of the Bituminous ruling is, I believe, succinctly set forth in the Amicus Brief of NAIC:
 
 
 66
 For more than half a century, since prior to enactment of the Revenue Act of 1921, it has been recognized that rules of accounting applicable to ordinary businesses distort income when applied to property and casualty insurance companies. This distortion derives from the fact that in general commerce, expenses precede income: a manufacturer must incur the cost of manufacturing his product before he gets paid for it. However, in the insurance industry the reverse is true: the policyholder pays the insurance company in advance and the insurance company's costs, which are primarily the payment of claims and the expenses related thereto, come afterwards. If the premiums were to be taxed as received and deductions allowed only as they become fixed, the result would be to distort property and casualty insurers' tax liability by taxing very large sums when in fact such sums will never really become income because they will have to be paid out in settlement of claims, for the expenses of settling those claims, and for other operating expenses. (Emphasis supplied.)
 
 
 67
 Brief of Amici Curiae, p. 2.
 
 
 68
 I would thus hold that the Tax Court decision is clearly erroneous. I would do so with full recognition of the rule that determinations made by the Commissioner of Internal Revenue are presumptively correct and that the burden rests on the taxpayer to establish error. Merchants National Bank of Topeka v. Commissioner of Internal Revenue, 554 F.2d 412 (10th Cir. 1977); Ruidoso Racing Commission, Inc. v. Commissioner, 476 F.2d 502 (10th Cir. 1973). I believe that the following language from Continental Insurance Company v. United States, 474 F.2d 661, 200 Ct.Cl. 552 (1973), is pertinent to the case at bar:
 
 
 69
 . . . there is no question of tax avoidance presented here, but merely a question when salvage is to be taken into account for purposes of the federal income tax . . . In these circumstances it seems best not to overthrow long-established practice merely to accelerate the receipt of taxes. Such a course of action would cause needless trouble and expense to insurance companies without the realization of any significant off-setting advantage to the government.
 
 
 70
 474 F.2d, at p. 671.
 
 
 71
 Valid business reasons have always been considered in the determination of tax consequences. Cravens v. Commissioner of Internal Revenue, 272 F.2d 895 (10th Cir. 1959). I believe that there are valid business reasons why there are no statutory provisions requiring insurance companies subject to the provisions of § 832, supra, to pursue an accrual method of accounting mandated upon life insurance companies under § 818(a) of the Code.
 
 
 72
 Thus, I would hold that the Tax Court erred in ruling that Western is not entitled to deduct agents' commissions in respect of installment premiums in the taxable period in which such premiums are reported in the underwriting and investment exhibit of the Annual Statement in accordance with the instruction of NAIC.
 
 
 
 [1]
 The text of § 481(a) is as follows:
 SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.
 (a) General Rule. In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")
 (1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then
 (2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.
 
 
 [2]
 Were it not for § 481(a) making provision for this, the statute of limitations (§ 6501(a) ) would be an impediment to correcting deductions taken during taxable years before 1967, the year of the change
 
 
 [3]
 Treas. Reg. § 1.446-1(c)(1)(ii) (1973). Under accrual method, income is to be included for the taxable year when all of the events have occurred which fix the right to receive such income and the amount can be determined with reasonable accuracy