**Monroe J. WEINTRAUB, Plaintiff,**

v.

**TEXASGULF INC., et al., Defendants.**

No. 81 Civ. 4563 (JES).

United States District Court,
S.D. New York.

June 6, 1983.

**1467**

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for plaintiff; Richard J. Rubin, Charla R. Bikman, New York City, of counsel.

White & Case, New York City; for defendants Texasgulf Inc., John P. Gallagher and Richard M. Thomson; P.B. Konrad Knake, Margaret Murphy, George Richardson, New York City, of counsel.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendants Canada Development Corp., H. Anthony Hampson, and Pierre Cote, New York City, Sheldon Raab, P.C., David E. Weisberg, Irwin Blum, New York City, of counsel.

## OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff, Monroe Weintraub, a holder of Texasgulf, Inc. ("Texasgulf") shares and options, commenced this action pursuant to section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b–5, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"),[1] against Texasgulf; Richard D. Mollison, its president and chairman of the board ("Mollison"); Canada Development Corporation ("CDC"), formerly the controlling shareholder of Texasgulf;[2] H. Anthony Hampson, CDC's president, chief executive officer and a director of both CDC and Texasgulf ("Hampson"); and Richard Thomson ("Thomson"), a director of Texasgulf and chairman of the board and chief executive officer of the Toronto Dominion Bank (the "Bank"), CDC's banker, alleging that the defendants' material misrepresentations and omissions caused him to dispose of certain of his interests in Texasgulf prior to the announcement of a tender offer on July 26, 1981, at a price substantially lower than what he would have received had he disposed of them pursuant to the tender offer.

In February of 1981, representatives of CDC met with representatives of Société

---

1. Shares of Texasgulf common and preferred stock were, at all relevant times, traded on the New York Stock Exchange and on other stock exchanges in the United States and Canada.

2. Defendant CDC beneficially owned 26,474,-499 shares of common stock of Texasgulf, or approximately 36% of the total outstanding Texasgulf stock.

Nationale Elf Aquitaine ("SNEA"). While plaintiff contends that, at this meeting, CDC and SNEA negotiated for the takeover of Texasgulf by means of a tender offer to be made by a subsidiary of SNEA to be organized for that purpose, Plaintiff's Second Amended Complaint at paras. 19, 22, defendants assert that these discussions concerned only the possibility of CDC's acquiring SNEA's equity interest in Aquitaine Company of Canada Ltd. In any event, it is undisputed that negotiations between CDC and SNEA continued and that, by April 1981, the discussions focused on the possibility of a transaction involving CDC's holdings in Texasgulf stock.[3] Memorandum of Defendants CDC, Hampson and Cote in Support of Summary Judgment at 7.

Mollison, Texasgulf's president, testified that since he was concerned about the possibility of a takeover, and believed that any takeover attempt would necessarily involve some contact with CDC, Texasgulf's controlling shareholder, he approached Hampson, CDC's president, in April of 1981 and inquired whether Hampson knew "anything about any activity on anybody's part that would lead to some action concerning Texasgulf." (Deposition of Richard D. Mollison at 7, Exhibit 1 to Plaintiff's Memorandum in Opposition to the Motion for Partial Summary Judgment made on behalf of Defendants CDC, Hampson and Cote.) Hampson, according to Mollison, responded in the negative and assured him that he would bring anything of substance to the Texasgulf board's attention. *Id.*

Sometime between April 28 and May 4 of 1981, the Bank purchased 90,000 shares of Texasgulf stock. Shortly thereafter, on May 7, 1981, CDC converted 1,225,200 shares of Texasgulf preferred shares into 1,952,509 shares of Texasgulf common. While plaintiff suggests that the timing of this conversion is suspect, and may be evidence of insider trading, Hampson testified that the conversion was effectuated in order to take advantage of a dividend increase announced by Texasgulf on April 22,

1981. (Affidavit of H. Anthony Hampson at 1–2 appended to Reply Memorandum of Defendants CDC, Hampson and Cote in Support of Summary Judgment.) Hampson further testified that the conversion had nothing to do with any discussions between CDC and SNEA regarding the possibility of an agreement concerning Texasgulf. *Id.* at 2.

During the month of May, activity in Texasgulf stock began to increase and rumors of the possibility of a takeover began to circulate. Deposition of Stuart Crane at 36–39. As a consequence, on May 19, 1981, Mollison again met with Hampson and inquired whether there were any on-going negotiations regarding a takeover of Texasgulf. According to Mollison, Hampson responded in the negative and failed to disclose whether any negotiations were taking place. (Deposition of Richard Mollison at 10, Exhibit 1 to Plaintiff's Memorandum in Opposition to the Motion for Partial Summary Judgment made on behalf of Defendants CDC, Hampson and Cote.) Hampson testified that he is virtually certain that he and Mollison had no such discussion at that time. (Deposition of H. Anthony Hampson at 52–53, Exhibit 2 to Plaintiff's Memorandum in Opposition to the Motion for Partial Summary Judgment made on behalf of Defendants CDC, Hampson and Cote.)

On May 21, 1981, at a CDC board of directors' meeting, the CDC board was informed of the possibility of a transaction whereby SNEA would acquire the non-Canadian assets of Texasgulf through a tender offer for Texasgulf shares and a subsequent acquisition of CDC's controlling interest pursuant to an exchange whereby CDC would receive certain of Texasgulf's Canadian assets in return. The board agreed that negotiations should continue. (Minutes of a Meeting of the Board of Directors of CDC held on May 21, 1981 at 3–4, Exhibit G to Affidavit of David Weisberg submitted in support of Defendants CDC, Hampson and Cote's Motion for Partial Summary Judgment and in Opposition

---

**3.** According to CDC, the concept of an agreement concerning Texasgulf was discussed at a meeting between CDC and SNEA representatives in Paris in April 1981.

to Plaintiff's Motion for Class Certification.) Hampson was among those present at the May 21 meeting. *Id.* at 2.

On June 1, 1981, Hampson approached Robin Korthals, president of the Bank, to inquire whether the Bank was interested in financing the proposed transaction.[4] Korthals informed Thomson of the substance of the meeting with Hampson on June 8, 1981. Deposition of Richard M. Thomson at 19–20.

The unusually high volume of trading in Texasgulf shares continued into early June. On June 2, 1981, at a meeting at Texasgulf headquarters in Connecticut, Mollison asked Hampson for a third time whether there was any possibility of a transaction relating to Texasgulf. Hampson testified that he responded to Mollison's inquiry by indicating that inquiries had been made concerning CDC's Texasgulf holdings and that, if a "concrete offer" were made, upon the CDC board's consideration of that offer, he would "obviously be letting the Texasgulf board know." (Deposition of H. Anthony Hampson at 55, Exhibit 2 to Plaintiff's Memorandum in Opposition to the Motion for Partial Summary Judgment made on behalf of Defendants CDC, Hampson and Cote.)

By early June the unusually heavy trading in Texasgulf stock attracted the attention of the New York Stock Exchange ("NYSE") which, on June 5, 1981, inquired of Texasgulf whether it knew of the reasons for the unusual trading activity. In response, Texasgulf stated that it knew of no reason. Subsequently, on June 18, 1981, at a meeting of the New York Society of Security Analysts, which meeting was attended by plaintiff's broker, Stuart Crane, a registered securities analyst, Mollison stated that he knew of no reason for the unusually high volume of trading in Texasgulf stock. On June 19, 1981, the NYSE again inquired of Texasgulf whether there was any possible explanation for the heavy trading in its stock. Again Texasgulf responded that it knew of no reason. A third inquiry was made on June 23, 1981, but

Texasgulf's response remained the same. The same day, in response to a telephonic inquiry from Dow Jones' Toronto Office, a CDC employee indicated that CDC had no intention of selling its Texasgulf shares. Dow Jones then issued a statement to that effect over the Broadtape.

On the same day, June 23, 1981, allegedly in reliance on Mollison's statements at the security analysts' meeting and the CDC release, plaintiff sold 1,000 shares of Texasgulf common at $35 per share, substantially less than he would have received had he disposed of the shares pursuant to the tender offer. Two days later, however, he purchased 1,000 shares of Texasgulf common. In an effort to explain the purchase, plaintiff's broker testified that he thought that CDC's statements were invalid and that the market was right for purchasing the stock. Deposition of Stuart Crane at 84–85.

On June 25, 1981, the board of directors of CDC met to consider the agreement between CDC and SNEA regarding Texasgulf and approved it in principle. According to CDC, the agreement was not finalized until minutes before 10:00 A.M. on June 26, 1981, when the tender offer was made public.

Texasgulf, Mollison and Thomson have moved for summary judgment as to all claims against them. CDC and Hampson have moved for partial summary judgment with respect to all claims arising prior to June 23, 1981. Plaintiff has moved for class certification, which motion is opposed by all defendants.

## TEXASGULF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's Rule 10b–5 claims against Texasgulf are based upon (1) Mollison's allegedly intentional misstatements at the June 18th meeting of the New York Society of Security Analysts; and (2) Texasgulf's failure to conduct an investigation into the reasons for the unusually heavy trading in

---

**4.** Hampson also approached two other Canadian banks in late May and early June with similar proposals. Deposition of H. Anthony Hampson at 72 appended to Texasgulf's Motion to Dismiss.

its stock and to disclose those reasons to the public.

It is well settled that scienter is an element of a Rule 10b–5 violation. Therefore, Mollison's speech is not actionable under Rule 10b–5 unless Texasgulf or Mollison knew or are properly chargeable with knowledge that CDC and SNEA were negotiating for the takeover of Texasgulf.

■ While plaintiff does not allege that Texasgulf or Mollison had any actual knowledge of the CDC–SNEA negotiations, he seeks to impute to Texasgulf and to Mollison the knowledge of the interlocking directors, Hampson, John P. Gallagher and Pierre Cote,[5] directors of both Texasgulf and CDC, and Thomson, director of both Texasgulf and the Bank. However, it is clear that a director's knowledge may not properly be imputed to a corporation unless it is gained within the scope of his activity with respect to that corporation, *see Scientific Holding Co. v. Plessey, Inc.,* 510 F.2d 15, 26 (2d Cir.1974) (citing *Hurley v. John Hancock Mutual Life Ins. Co.,* 247 App.Div. 547, 550, 288 N.Y.S. 199, 202 (4th Dep't 1936)). Since plaintiff concedes that the interlocking directors acquired their knowledge of the takeover in their capacities as CDC and Bank directors, and not as Texasgulf directors, their knowledge may not properly be imputed to Texasgulf. *A fortiori,* it follows that it may not be imputed to Mollison.[6]

■ Plaintiff next contends that Texasgulf had an absolute duty to investigate the reasons for the unusually heavy trading in its stock, and that its failure to do so affords a basis for a securities law claim. The Second Circuit has held, however, that there is no duty to conduct such an investigation absent a showing that the subject of the rumors is also their source. *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 850–51 (2d Cir.1981). Plaintiff does not allege that Texasgulf or Mollison was the source of the market rumors, nor is

there any factual support for that claim set forth in the papers submitted to this Court. Since Texasgulf had no duty to conduct an investigation, its failure to do so cannot form the basis for a claim for relief under the securities laws. Texasgulf and Mollison are, therefore, entitled to summary judgment.

■ Plaintiff also seeks to impose liability on Richard Thomson, an interlocking director of both Texasgulf and the Bank, on the theory that his failure to disclose the CDC–SNEA discussions to Texasgulf amounts to a violation of Rule 10b–5. Plaintiff cites no authority in support of the proposition that a person sitting on the board of directors of one corporation, here Texasgulf, has a duty to disclose to that corporation information acquired in his capacity as a director of another corporation, i.e., the Bank. Indeed, if Thomson had disclosed to Texasgulf information regarding the Bank's business dealings with CDC, he might well have been in breach of the fiduciary duties he owed to the Bank.

To accept plaintiff's argument would necessarily lead to the conclusion that Section 10(b) liability would exist in any case where interlocking directorships exist and where information learned as a member of one board is not disclosed to the other corporation. Nothing in either the statute, its legislative history or the case authorities construing Section 10(b) and Rule 10b–5 remotely suggests that Section 10(b) liability may properly be predicated upon a failure to disclose information where the disclosure of that information might well be a breach of a fiduciary obligation owed to another person. The practical effect of such a holding would not only make interlocking directorships impossible, but would also be inconsistent with the underlying purpose of the securities laws which endeavor to enforce the performance of fiduciary obligations by imposing liability for their breach.

---

**5.** Although plaintiff originally named Gallagher and Cote as defendants, he has discontinued this action against them.

**6.** The cases which hold that a director's knowledge may be imputed to a corporation if the

knowledge was acquired pursuant to the director's activities for that corporation do not stand for the proposition that such knowledge may be imputed to other directors.

The Court, therefore, concludes that Thomson's failure to disclose the CDC–SNEA negotiations to Texasgulf is not actionable under Rule 10b–5. Accordingly, Thomson's motion for summary judgment is granted.

## CDC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

█ Plaintiff contends, *inter alia*, that CDC and Hampson are liable for Hampson's alleged material misrepresentations to Mollison regarding the status of the CDC–SNEA negotiations, which material misrepresentations were in turn communicated to plaintiff's broker at the security analysts' meeting. He also contends that CDC omitted to disclose material information regarding the tender offer although it had a duty to do so prior to June 23, 1981. Since there exist material issues of fact with regard to (1) the nature and extent of Hampson's statements to Mollison; and (2) CDC's liability, if any, for Hampson's actions, CDC's motion for partial summary judgment, joined in by Hampson, must be denied.[7]

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

█ Plaintiff seeks to represent all persons who sold Texasgulf shares and options from April 1, 1981 through June 25, 1981. To comply with Fed.R.Civ.P. 23(a)(4), plaintiff must establish that he will be an adequate representative of the proposed class. Plaintiff's conduct, however, demonstrates that he is not an adequate representative of the class. While he asserts that he was induced to sell his Texasgulf holdings as a result of the allegedly misleading statements of Hampson and Mollison, he in fact purchased 1,000 shares of Texasgulf on June 25, 1981 prior to the announcement of the tender offer. Moreover, after the announcement of the tender offer on June 26, 1981, plaintiff sold his shares on the open market at a price substantially lower than the ultimate tender offer price.

Plaintiff's broker seeks to explain plaintiff's conduct by characterizing his actions as part of a "hedging operation." Deposition of Stuart Crane at 97. That circumstance, however, further demonstrates that plaintiff is not an adequate representative of the class. Rather, it establishes that plaintiff was a sophisticated speculative trader whose unusual trading activities will give rise to unique defenses that may have the ultimate effect of prejudicing members of the proposed class. *See Kline v. Wolf,* 88 F.R.D. 696, 699 (S.D.N.Y.1981). Additionally, plaintiff's conduct will have a negative impact on his credibility at trial. *See Panzirer v. Wolf,* 663 F.2d 365, 368 (2d Cir. 1981), *vacated on other grounds sub nom. Price Waterhouse v. Panzirer,* —— U.S. ——, ·103 S.Ct. 434, 74 L.Ed.2d 594 (1982). For the foregoing reasons, the Court finds that plaintiff has failed to satisfy the requirements of Fed.R.Civ.P. 23(a)(4). Therefore, the motion for class certification is denied.

It is SO ORDERED.

---

**7.** In view of plaintiff's position at oral argument that CDC's conversion of Texasgulf preferred shares into common shares may be evidence of insider trading, there also may exist a material question of fact regarding when CDC's duty to disclose the impending tender offer accrued.