Jerry ETSHOKIN, Plaintiff,

v.

TEXASGULF, INC., Richard Mollison, Canada Development Corporation, H. Anthony Hampson, Pierre Cote, and John P. Gallagher, Defendants.

No. 82 C 6286.

United States District Court,
N.D. Illinois, E.D.

Jan. 13, 1984.

William V. Johnson, Pamela L. Gellen, Lawrence A. Elster, Johnson, Cusack & Bell, Ltd., Chicago, Ill., for plaintiff.

Alan N. Salpeter, James D. Brusslan, Mayer, Brown & Platt, Chicago, Ill., P.B. Konrad Knake, White & Case, New York City, for defendants Texasgulf, Inc., Richard Mollison and John P. Gallagher.

Edward L. Foote, Stephen C. Schulte and John W. Stack, Winston & Strawn, Chicago, Ill., Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendants Canada Development Corp., H. Anthony Hampson, and Pierre Cote.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

Plaintiff Jerry Etshokin commenced this action by filing a four-count complaint against defendants alleging violations of various securities laws and regulations. He later amended his complaint to include a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 (1976).[1] Defendants have moved to dismiss the RICO count for failure to state a claim upon which relief may be granted. Three of the defendants have moved for summary judgment on counts 1 through 4.

## COUNTS 1–4

Plaintiff is a member of the Chicago Board Options Exchange, Inc. ("CBOE"). Complaint ¶ 3. He was a "market maker," trading options on, among other things, common stock of defendant Texasgulf, Inc. ("Texasgulf") on the CBOE. *Id.* ¶ 9.

From February 1 through June 26, 1981, plaintiff alleges, his trading consisted primarily of sales of "call" options, "thus placing [him] in an increasingly 'short' position." *Id.* A call option gives the holder of the option the right to require another party, here plaintiff, to redeem the option in shares of a given stock. Plaintiff's trades in Texasgulf call options were, he alleges, predicated on his belief that Texasgulf was not a likely merger or takeover subject, that absent a merger or takeover the price of Texasgulf stock would not increase, and that therefore the call options would not be exercised and plaintiff would not be required to purchase Texasgulf stock to cover the options. *Id.*

Texasgulf is a natural resources company which finds, develops and produces chemicals, metals, and energy products. *Id.* ¶ 4. At all times relevant to this action, approximately 37% of the outstanding common stock of Texasgulf was owned by a wholly-owned subsidiary of defendant Canadian Development Corporation ("CDC"), a Canadian corporation approximately 90% owned by the Canadian government. *Id.* ¶ 5. Defendants H. Anthony Hampson, Pierre Cote, and John P. Gallagher were all directors of both CDC and Texasgulf; Hampson was also president and chief executive officer of CDC. *Id.* ¶ 7. Defendant Richard Mollison was chairman of the board and chief executive officer of Texasgulf. *Id.* ¶ 6.

Plaintiff alleges that on or about February 1, 1981, representatives of CDC began negotiations with a French corporation, Societe Nationale Elf Aquitaine ("SNEA") for the sale of CDC's Texasgulf stock. These negotiations were not publicly disclosed until June 26, 1981. *Id.* ¶ 10. However, rumors began to circulate that Texasgulf might be a takeover target, and Canadian investors began accumulating Texasgulf stock. *Id.* ¶ 11. Plaintiff alleges that at a June 18, 1981 meeting of the New York Society of Security Analysts, Mollison denied that CDC had any interest in disposing

---

1. Plaintiff's RICO count is misnumbered count 6. It should be count 5. Another securities fraud count subsequently filed should therefore be numbered count 6 rather than count 7.

of its Texasgulf stock and "implied" that he had received no information that would supply a basis for the rumors of an impending takeover. *Id.* ¶ 13. Plaintiff asserts that he relied on this statement in formulating his investment plans. *Id.* ¶ 15.

On June 23, 1981, CDC allegedly released to the Dow Jones Newswire a statement that it had no intention of selling its interest in Texasgulf and that it was unaware of the reason for the trading activity in Texasgulf stock. *Id.* ¶ 17. At that time, plaintiff alleges, CDC and SNEA had already agreed on the terms and conditions of a sale of CDC's Texasgulf stock to SNEA and a tender offer to be made for the remainder of Texasgulf's stock by a subsidiary (to be created) of SNEA. *Id.* ¶ 18. Plaintiff alleges that he relied on this statement in formulating his investment plans. *Id.* ¶ 20.

An agreement between CDC and SNEA for the sale of CDC's Texasgulf stock, and a tender offer by SNEA for the remainder of Texasgulf's stock, were publicly announced on June 26, 1981. The offer was to be at $50 per share. This was increased to $56 per share on July 6, 1981. *Id.* ¶ 22. Due to a rise in the market price of Texasgulf stock as a result of the tender offer announcement, many of the call options plaintiff had sold were exercised and plaintiff was forced to cover. His covering purchases for options sold between February 1 and June 26, 1981 totalled over $1.2 million.

As described in the complaint and explained in plaintiff's response to the motion for summary judgment, plaintiff's securities fraud claims are based on several theories. First, if Mollison knew of the impending takeover when he denied the rumors, he is liable for making material and misleading statements, and Texasgulf is liable vicariously. Second, since Mollison and Texasgulf made public assurances that no tender offer was pending, they had a duty of reasonable inquiry to determine whether their statements were true. Third, plain-

tiff argues that the knowledge of the "interlocking" directors (Hampson, Cote, and Gallagher) must be imputed to Texasgulf and that since these directors knew of the CDC–SNEA negotiations before June 26, 1981, Texasgulf is deemed to know of them as well and its public denials were therefore misleading. Finally, it appears that plaintiff asserts that the interlocking directors had a duty individually to correct Texasgulf's denials once they became aware of the CDC–SNEA negotiations.[2]

Texasgulf, Mollison, and Gallagher have moved for summary judgment on plaintiff's securities fraud claims. They argue that the statement attributed to Mollison by plaintiff was never made and even if made was not false or misleading; that the knowledge of the interlocking directors cannot be attributed to Texasgulf; and that Texasgulf had no duty under the circumstances presented here to inquire into the "market rumors" concerning the impending takeover. The motion is based primarily on discovery taken and a decision rendered in a similar case, *Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466 (S.D.N.Y. 1983), though defendants have supplemented the record with affidavits. Plaintiff's response to the motion is based in part on the assertion that plaintiff needs to take discovery here not taken in the *Weintraub* case and that summary judgment would thus be unfair. We will nevertheless discuss the merits of defendants' motion, for even if plaintiff's position is well taken it may be possible to pare down the lawsuit considerably.

### 1. *Mollison's alleged misstatements*

■ Defendants first argue that Mollison never made the misstatements that plaintiff attributed to him. Defendants have submitted a transcript of the June 18 meeting of the securities analysts. The only comments contained in the transcript relating in any way to CDC or Texasgulf stock are the following:

2. This listing does not include plaintiff's claims relating to alleged misstatements by CDC, as CDC, Hampson, and Cote have not moved for summary judgment on the securities fraud claims.

QUESTION. Do you know whether Canadian Development Corp. has been buying your stock in the last quarter, and what their ownership objectives in the company may be?

CHAIRMAN MOLLISON. My belief and understanding of that is that the only purchases that CDC has made for nearly two years is through its participation in our dividend reinvestment plan. I don't think they have been making any purchases other than that.

QUESTION. If I could ask a follow-up question: To what extent has your preferred stock been converted since your dividend on old stock went over the attractive rate?

CHAIRMAN MOLLISON. There was quite a large surge of conversion in May. That is still taking place on a gradual basis. It is probably 10,000 or 20,000 shares per day—something of that sort. I think there is something like 600,000 shares of preferred still out. But we expect it to disappear gradually.

Motion for Summary Judgment, Ex. H at 25. The questioner is identified as Stuart Crane, who was the broker for the plaintiff in *Weintraub. See Weintraub,* 564 F.Supp. at 1469. At his deposition in the *Weintraub* case, Crane testified that the transcript accurately recorded his questions and Mollison's answers. *See* Motion for Summary Judgment, Ex. G (Crane deposition) at 44–45, 112–14.

Plaintiff has not contradicted the transcript in any way, nor has he suggested that additional discovery could disclose evidence that Mollison said anything other than the statements recorded in the transcript. Careful examination of Mollison's answer to Crane's first question shows that Mollison did not, as alleged in the complaint, deny that CDC was planning to dispose of its Texasgulf stock or imply that he had no information to support the rumors of a takeover. In fact, Mollison actually did not answer that part of Crane's ques-

tion that concerned CDC's ownership objectives. Plaintiff cannot use Mollison's statement as the basis for his securities fraud claim.[3]

Perhaps recognizing that he cannot succeed on the June 18 statement, plaintiff asserts that Texasgulf "made affirmative public statements denying takeover negotiations on June 5, June 19 and June 23, in response to New York Stock Exchange inquiries...." Plaintiff's Memorandum in Opposition to Motion for Summary Judgment at 4. Though plaintiff has submitted no factual basis for this assertion, the *Weintraub* opinion mentions statements by Texasgulf on those dates that it knew of no reason for the "unusual" trading activity in its stock, *Weintraub,* 564 F.Supp. at 1469, and defendants concede that Texasgulf issued press releases on June 5 and June 23 stating as follows:

> In response to an inquiry from the New York Stock Exchange, Texasgulf Inc. stated that the company knew of no reason for the trading activity in the company's stock.

Reply Memorandum of Defendants at 3. Our inquiry thus turns to the question whether, assuming Mollison was responsible for the releases, the releases provide a basis for plaintiff's claims.

Though plaintiff concedes that "thus far" there exists no evidence that Mollison knew of the CDC–SNEA negotiations until June 26, 1981, he asserts that "additional discovery could bring to light contradictory evidence." When it comes to specifics, however, plaintiff identifies only one deposition other than those taken in *Weintraub* that he wishes to take in the present case. Plaintiff states that he wants to depose James Hague, executive vice president of CDC, who allegedly was a primary negotiator in the CDC–SNEA deal. Plaintiff does not suggest that Hague has any evidence relating to Mollison's knowledge; rather,

---

**3.** In light of the lack of evidence supporting plaintiff's version of Mollison's statement, plaintiff's professed need for discovery concerning Mollison's knowledge of CDC's intentions as of June 18, 1981 is simply irrelevant insofar as it relates to Mollison's making of the June 18 statements.

he argues that Hague's deposition might turn up evidence that the interlocking directors acquired their knowledge of the deal in their capacities as Texasgulf directors and thus that their knowledge should be attributed to Texasgulf for purposes of this case. Plaintiff's Memorandum in Opposition to Motion for Summary Judgment at 7–8. That will not help plaintiff against Mollison, since plaintiff does not argue that the knowledge of other Texasgulf directors is to be attributed to Mollison (as opposed to the company). *See Weintraub,* 564 F.Supp. at 1470 n. 6.

The Federal Rules of Civil Procedure provide a method by which a party can delay adjudication of a motion for summary judgment where more discovery is needed in order to oppose the motion:

> Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). A party invoking rule 56(f) " 'must do so in good faith by affirmatively demonstrating why he cannot respond to a movant's affidavit ... and how postponement ... will enable him ... to rebut the movant's showing of the absence of a genuine issue of fact.' " *Lamb's Patio Theatre, Inc. v. Universal Film Exchanges, Inc.,* 582 F.2d 1068, 1071 (7th Cir.1978) (quoting *Willmar Poultry Co. v. Morton-Norwich Products, Inc.,* 520 F.2d 289, 297 (8th Cir.1975), *cert. denied,* 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976)). As far as Mollison's alleged wrongdoing is concerned, plaintiff has not complied with the requirements of rule 56(f) by showing how additional discovery

might establish that Mollison is responsible for the June 5, 19, and 23 statements and that he knew of information such that the public statements were, in light of his nondisclosure of that information, misleading.[4]

We are inclined to enter summary judgment in Mollison's favor since plaintiff has not identified how he plans to show that Mollison is liable to him. This lawsuit was commenced in October 1982, some sixteen months ago, and plaintiff therefore has had ample opportunity to engage in discovery. We are reluctant, however, to take action that might trigger a motion to reconsider and further briefing. Thus, we will require plaintiff to inform us, within two weeks of entry of this order, of the discovery he plans to take with respect to Mollison and how that discovery might establish Mollison's liability. If plaintiff does not make a sufficient showing of these matters we will enter judgment in Mollison's favor.

## 2. *Duty of inquiry*

Since there is no evidence that Mollison made any false or misleading statements on June 18, plaintiff's claim against Texasgulf turns on the three press releases referred to earlier. The gist of these statements was that Texasgulf "knew of no reason" for the trading activity in its stock.

As a general rule, a corporation has no interest in its outstanding stock. *See Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 377 (2d Cir.1980). Nor does it have a duty to correct or verify rumors in the marketplace unless those rumors can be attributed to the company, a foundation not laid by plaintiff here. *State Teachers Retirement Board v. Fluor Corp.,* 654 F.2d 843, 850 (2d Cir.1981); *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 162–63 & n. 8 (2d Cir.1980) (citing cases); *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 949 (2d Cir.1969).

---

**4.** We recognize that plaintiff asserts that Mollison had a duty of inquiry with regard to the alleged misstatements. Even under plaintiff's theory, however, no duty of inquiry can arise unless the party in question is somehow responsible for making a statement that triggers the duty. Nor has plaintiff alleged that Mollison is a "controlling person" under 15 U.S.C. § 78t(a) (1976) such that he is vicariously responsible for Texasgulf's wrongdoing. *See also* Part A. 2, *infra.*

Plaintiff suggests that having assured the public that it was not the subject of a takeover, Texasgulf had a duty to make reasonable inquiry in order that its representations would not be false or misleading. In *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), the court stated that

> [i]t does not appear to be unfair to impose upon corporate management a duty to ascertain the truth of any statements the corporation releases to its shareholders or to the investing public at large. Accordingly, we hold that Rule 10b–5 is violated whenever assertions are made ... in a manner reasonably calculated to influence the investing public, e.g., by means of the financial media ..., if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes. It seems clear, how·· ever, that if corporate management demonstrates that it was diligent in ascertaining that the information it published was the whole truth and that such diligently obtained information was disseminated in good faith, Rule 10b–5 would not have been violated.

*Id.* at 861–62. Moreover, as noted by the courts in *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1317 (5th Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978) and *Issen v. GSC Enterprises, Inc.*, 538 F.Supp. 745, 751 (N.D.Ill. 1982) (Aspen, J.), under rule 10b–5, when a party undertakes to disclose anything, it has the duty to speak the full truth.[5] The problem plaintiff faces in the present case is that as it relates to Texasgulf's press releases, the "full truth" would involve a

determination whether Texasgulf actually knew of a reason for the trading activity in its stock. Even under plaintiff's theory, since the allegedly misleading disclosure concerned the company's "state of mind" and not objective facts, the only duty of inquiry that Texasgulf or its officers might have had was to ascertain whether the company at that time knew of a reason for the activity. We see no basis, even under *SEC v. Texas Gulf Sulphur*, for imposing upon Texasgulf a duty to determine whether there *actually was* a reason for the trading activity in its stock apart from reasons of which the company knew.

Plaintiff argues that Texasgulf did know of the reason for the trading activity in its stock, via the interlocking directors. We will deal with that contention in the next section. Plaintiff suggests that Mollison knew of the CDC–SNEA negotiations; if that is correct, the Texasgulf press releases may well have been misleading and therefore actionable. As we have noted, however, plaintiff does not now have any evidence of this, and his suggestion that additional discovery may turn up evidence of Mollison's knowledge is at best conclusory. In order to determine whether plaintiff's claim against Texasgulf may stand, we will look first to plaintiff's argument that the knowledge of the interlocking directors should be attributed to Texasgulf. If plaintiff wishes to maintain a claim based on Mollison's knowledge he will have to make a showing similar to that described at the end of Part A.1, *supra*.

*3. Knowledge of interlocking directors.*

Plaintiff next contends that Hampson, Cote, and Gallagher's knowledge of the CDC–SNEA negotiations should be attributed to Texasgulf and that in light of

---

**5.** After briefing was closed, defendants called the recent opinion in *Greenfield v. Heublein, Inc.*, 575 F.Supp. 1325 (E.D.Pa.1983) to our attention. In *Greenfield*, the court held that a potential merger target had no affirmative duty to disclose the potential merger until an "agreement in principle" was reached. The court further held that a press release similar to those in the present case was not misleading despite the target's knowledge of a potential merger and

that no "duty to correct" arose until agreement in principle as to a merger was reached. We think that the latter holding conflicts with the principle that one who has spoken must under rule 10b–5 speak the whole truth. If Texasgulf was aware of the CDC–SNEA negotiations *and* that those negotiations were a reason for the trading activity in its stock, its denials were misleading under rule 10b–5.

that attribution, Texasgulf's press releases were untrue and/or misleading. However, the general rule is that the knowledge of a corporate officer or agent is attributed to the corporation if the officer or agent acquired the knowledge while acting in the course of his employment with the corporation within the scope of his authority. Knowledge acquired by a director not acting within the scope of his official duties generally is not imputed to the corporation. *See generally* 3 W. Fletcher, Cyclopedia of the Law of Private Corporation §§ 790, 793 (Rev. ed. 1975) (hereinafter cited as "Fletcher").[6] *See also United Disposal & Recovery Co. v. Industrial Commission,* 291 Ill. 480, 126 N.E. 183 (1920); *Niman v. Pecatonica Livestock Exchange,* 13 Ill. App.2d 144, 141 N.E.2d 327 (1957). Hampson testified at his deposition that he carried on his negotiations "in [his] capacity as President and Chief Executive Officer of CDC, not in [his] capacity as a Director of Texasgulf." Hampson Dep. at 47. Defendants have not submitted any evidence as to Cote and Gallagher. Hampson knew of the possibility of SNEA acquiring Texasgulf by April 1981; Cote became aware of it at least as early as May 21, 1981; and Gallagher knew by June 23 or 24. Memorandum of Texasgulf, Inc., etc. in Support of Motion for Dismissal or for Summary Judgment at 4–6.

Defendants also claim that in relation to the CDC–SNEA negotiations, the interlocking directors had interests adverse to those of Texasgulf and thus their knowledge of those negotiations cannot be attributed to Texasgulf. The legal basis for defendants' argument appears to be firm. *See Schoenbaum v. Firstbrook,* 405 F.2d 200, 211 (2d Cir.) (citing cases), *rev'd in part en banc on other grounds,* 405 F.2d 215 (2d Cir.1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); 3 Fletcher, *supra* § 819. Defendants contend that the interests of CDC included keeping the negotiations with SNEA secret from Texasgulf, which was a subject of the negotia-

tions. They do not cite any evidentiary support for this contention.

Plaintiff's response is twofold. First, plaintiff asserts that additional discovery may turn up evidence that one or more of the interlocking directors was acting within the scope of his authority as a Texasgulf director as well as within the scope of his authority as a CDC director. This is interrelated with plaintiff's second response, which is that discovery might disclose that CDC and the individual interlocking directors had substantial control of Texasgulf such that their knowledge should be imputed to the latter corporation despite the fact that they may have been acting outside the scope of their authority as Texasgulf directors. Though plaintiff does not spell out the interrelation between these two arguments, it could be argued that if CDC and the interlocking directors were in fact in control of Texasgulf, their actions in facilitating a takeover of the company might, in addition to being in the interest of Texasgulf as well, as determined by CDC, the controlling shareholder of Texasgulf.

It appears to be the law at least in some states that the knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation even if those officer and directors acquired their knowledge while acting outside the scope of their official duties. *See Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 427 F.2d 862, 869 (4th Cir.1970) (Maryland law). As we have noted, *supra* at n. 6, the parties have not informed us as to the applicable law here, so we cannot yet determine whether the above proposition applies in this case. Moreover, we note that even under the *Phoenix Savings & Loan* standard, plaintiff has a very difficult road to travel in establishing the basis for imputing the knowledge of the interlocking directors to Texasgulf. However, we think that plaintiff is entitled to delve more deeply into the CDC–Texasgulf relationship and into the details of the SNEA negotiations

---

**6.** The parties have not informed us what state's law applies here; in any event, the above propo-

sition seems to be true in most if not all states. *See* 3 Fletcher, *supra* §§ 790, 793 (citing cases).

(the latter to determine on whose behalf the interlocking directors were acting).[7] This is contingent, however, on plaintiff informing us within two weeks of entry of this order of the specific discovery he plans to take on this issue and how that discovery might establish the basis for a claim against Texasgulf.

■ Assuming that plaintiff cannot show that the knowledge of the interlocking directors should be imputed to Texasgulf, plaintiff argues that the individual interlocking directors are nonetheless liable for failing to correct Texasgulf's press releases once they became aware of facts indicating that those press releases were misleading. Since it is not alleged that the interlocking directors made any statements of their own concerning the impending takeover or the trading activity in Texasgulf stock, any liability here must be based on some duty to disclose facts to Texasgulf or the public, for when an allegation of securities fraud is based on nondisclosure, there is no fraud absent a duty to speak. *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980).

In *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357 (2d Cir.1980), the court held that a corporate director who was aware of the intentions of a third party to seek control of the corporation breached no duty to the corporation by failing to disclose the third party's intentions to the corporation. *Id.* at 377, 378–79. This was based on the view that promoting a change of management does not necessarily constitute action in conflict with the corporation's best interests.[8] We agree with *Treadway*, and therefore hold that the interlocking directors had no duty to inform Texasgulf of the CDC–SNEA negotiations. Thus, Gallagher, one of the moving defendants

here, cannot be held liable for failing to disclose the fact that he learned on June 23 or 24 of the impending tender offer.

*4. Summary of securities law claims.*

Plaintiff cannot base a securities fraud claim on Mollison's alleged misstatements at the June 18 meeting with the securities analysts since it is on the present record undisputed that no misstatements were made. Any claim against Mollison can be based only on his knowledge of the impending takeover and his responsibility for Texasgulf's press releases. Any liability of Texasgulf can be based only on the imputation of the knowledge of the interlocking directors to the company or on Mollison's knowledge of the CDC–SNEA negotiations. The interlocking directors cannot be held liable for failing to disclose the CDC–SNEA negotiations to Texasgulf.

As for the claims that remain in the case, plaintiff is instructed by January 31, 1984, to submit a written statement signed by his counsel pursuant to Fed.R.Civ.P. 11. identifying the specific discovery he plans to take and how that discovery might assist him in establishing a right to relief in accordance with the views stated in this memorandum opinion.

COUNT 5 (RICO)

■ In his reply brief in support of his motion to amend the complaint to add the RICO count, plaintiff asserted that his RICO claim was based on two alleged criminal offenses by defendants: 1) wire fraud allegedly committed by CDC in connection with a news story issued by the Dow Jones Newswire on June 23, 1981, and 2) mail fraud allegedly committed by Mollison in connection with the statements he allegedly made to the securities analysts on June 18, 1981. Memorandum of Plaintiff in Reply to [Defendants'] Memorandum in Opposi-

---

**7.** This was not an issue in *Weintraub* since the plaintiff there conceded that the knowledge of the interlocking directors was acquired in the scope of their duties as CDC, not Texasgulf, directors. *Weintraub*, 564 F.Supp. at 1470.

**8.** To the extent that this appears to undercut defendants' argument that the knowledge of the

CDC directors should not be imputed to Texasgulf because of the conflict of interest between those directors and Texasgulf, we note that the alleged conflict here involves CDC's alleged interest in keeping the negotiations secret and not a prospective change in control.

tion to Plaintiff's Motion for Leave to Amend Complaint at 3.

Under the provision of RICO relied upon by plaintiff here, it is unlawful for any person to conduct or participate in the conduct of the affairs of an enterprise "through a pattern of racketeering activity" or to conspire to thus act. 18 U.S.C. § 1962(c), (d) (1976). "Pattern of racketeering activity," as defined in *id.* § 1961(5) "requires at least two acts of racketeering activity"; "racketeering activity" is defined in *id.* § 1961(1) as including any of a number of listed federal crimes.

In part A of this opinion, we found that there was no genuine issue of material fact as to Mollison's alleged denial on June 18 of the impending takeover; no such statement occurred. *See* pp. 1214–1215 *supra.* Moreover, we noted that plaintiff's purported need for additional discovery did not in any way effect that conclusion since plaintiff had not asserted that additional discovery could disclose evidence that Mollison had made the alleged comments. As far as the RICO count is concerned, the effect of this finding is to adjudicate adversely to plaintiff the allegations in the complaint of Mollison's alleged misstatement. Plaintiff thus cannot prove the requisite number of criminal acts, and he has not at any time referred to any other alleged "racketeering activity." For these reasons, plaintiff's RICO claim is dismissed.[9]

---

**9.** In light of our disposition of the RICO claim, we need not address defendants' other arguments in support of dismissal.