GERLING INTERNATIONAL
INSURANCE CO.

v.

COMMISSIONER OF
INTERNAL REVENUE.

Appeal of GERLING INTERNATIONAL
INSURANCE CO.

No. 87–1002.

United States Court of Appeals,
Third Circuit.

Argued Sept. 9, 1987.

Decided Jan. 29, 1988.

Jules Ritholz, Walter P. Stasiuk (argued), Edward C. Kesselman, Bryan C. Skarlatos, Kostelanetz, Ritholz, Tigue & Fink, New York City, for appellant.

Roger M. Olsen, Asst. Atty. Gen., Michael L. Paup, Gary R. Allen, Kenneth L. Greene (argued), Tax Div., Dept. of Justice, Washington, D.C., for appellee.

Before SLOVITER and STAPLETON, Circuit Judges, and FISHER, District Judge [*]

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

Gerling International Insurance Company (GIIC) appeals from a grant of summary judgment to the Commissioner of Internal Revenue (IRS), 87 T.C. 679, following the imposition of sanctions on GIIC for failing to produce certain information and documents which it claims to be unable to obtain. Finding the imposition of sanctions to be error, we will reverse the grant of summary judgment and remand to the Tax Court for further proceedings.

### I.

GIIC is a Delaware corporation with assets totalling about $700,000. Its only business, aside from investing its capital, involves a reinsurance contract which it entered into in 1957 with Universale Reinsurance Company, Ltd. (Universale), a Swiss corporation. Under this contract, or treaty, GIIC is to bear 20% of any losses on the non-life insurance risks assumed by Universale, and GIIC is to receive 20% of any profits Universale reaps from its non-life insurance risks.[1] Universale sends GIIC an annual statement, called the Technical Figures, which contains few details beyond the figures for GIIC's 20% share of Universale's gross premiums, losses, reserves, expenses, and net profit or loss, together with a check for 20% of Universale's non-life net profit or a bill for 20% of Universale's non-life net loss.[2] Universale also provides GIIC with its yearly summary of its accounts, called the "Exercise", and with documents published by the Swiss Office of Private Insurance, which inspects Universale's books annually. The treaty between Universale and GIIC includes various other provisions for the rights and responsibilities of the parties, such as a dispute resolution mechanism (arbitration in Switzerland), choice-of-law and choice-of-forum clauses for non-arbitrable disputes (Swiss law and Swiss courts), and access by GIIC (in Switzerland) to Universale's files on the risks covered by the treaty, so GIIC might verify the Technical Figures.[3] Additionally, GIIC agreed in the treaty to waive its right to receive a complete list of all the insurance and reinsurance risks assumed by Universale in which GIIC has a 20%

---

[*] Honorable Clarkson S. Fisher, United States District Judge for the District of New Jersey, sitting by designation.

**1.** There are two main kinds of reinsurance arrangements, indemnity reinsurance and assumption reinsurance. In the former, the reinsurer simply promises to indemnify the reinsured, i.e., the original insurer of the risk. In the latter, the reinsurer actually deals directly with the policyholder, replacing the reinsured. GIIC clearly has agreed to provide the indemnity type of reinsurance. Its contract can also be described as a "quota share" agreement, as it has taken on, or been ceded, a flat 20% of Universale's non-life risks. The agreement does not, however, fall into the category of coinsurance. Coinsurance arrangements provide that two or more insurers or reinsurers are liable to the policyholder, and a basic rule of reinsurance is that reinsurers are not directly liable to an insured unless they contract specifically to assume such liability, which GIIC has not done in this case. *See* G. Couch, Couch on Insurance, 2d (M. Rhodes ed. 1983), §§ 80:2, 80:69 at 624–25, 675–77; J. Appleman, Insurance Law & Practice (1976 & 1987 Supp.), §§ 7681, 7694 at 483–84, 531 & Supp. 100.

**2.** The IRS maintains that Universale's practice of sending a net bill or net check at the end of each year is inconsistent with the last paragraph of Article 7 of the treaty, which provides that:

> The share of Retrocessionaire in losses payable by Universale shall become due at the same day and shall be put at the disposal of Universale on which Universale itself must make payment.

App. at 582. The question of the proper timing of the deductions taken by GIIC under its contract with Universale may be important for determining GIIC's correct tax liability. Because of our conclusions on the other issues of the case, however, we do not reach this question.

**3.** GIIC's contract right of inspection is in Article 8 of its agreement with Universale, which reads:

> [GIIC] shall have the right through an authorized agent to inspect in the office of Universale all the files which affect the risks under this treaty. This right of inspection, however, shall not permit delay in the liquidation of the respective agreed-upon obligations.

App. at 582–83.

share.[4] According to GIIC, requiring a reinsured to compile such a list for a reinsurer is prohibitively expensive and is rarely or never done in the reinsurance business; the number of listings involved in this case would be about 1,400.

When GIIC has been entitled to a net profit under its arrangement with Universale, the profit has never amounted to more than $40,000 for any given year. In only one of the taxable years at issue here, 1976, did the GIIC–Universale agreement result in a net loss to GIIC. GIIC was able to use that loss to reduce its taxable investment income not only for 1976, but also for 1974 and 1973 by means of a net operating loss carryback.

The IRS audited GIIC for taxable years 1959–61. That audit ended happily for GIIC, as the IRS did not demand to look behind the Technical Figures and checks which GIIC had received from Universale. However, the IRS is now auditing GIIC for taxable years 1976–78, and will not so easily be satisfied.

GIIC is subject to tax under Internal Revenue Code § 831, like any other non-life or non-mutual insurance company. Its tax is determined under I.R.C. § 832, which requires use of an annual statement approved by the National Association of Insurance Commissioners (NAIC). The NAIC form is also used by state regulators of the insurance industry. I.R.C. § 832(a) provides that the taxable income of an insurance company such as GIIC is "the gross income as defined in subsection (b)(1) less the deductions allowed by subsection (c)."

Section 832(b)(1) provides that gross income is to be "computed on the basis of"

the underwriting and investment exhibits of the NAIC form. The regulations add that:

> The underwriting and investment exhibit is presumed to reflect the true net income of the company, and insofar as it is not inconsistent with the provisions of the Code will be recognized and used as a basis for that purpose.

Treas.Reg. § 1.832–4(a)(2). The NAIC form requires a reinsurer in GIIC's position to list as its gross income the full quota share of the gross income of its reinsured, rather than only the net figure actually received from the reinsured. Accordingly, GIIC must include in its gross income 20% of Universale's gross income from its non-life insurance business. Section 832(b) also requires that various items not listed on the NAIC form, such as gain from the disposition of property, be added to the gross income reported on the relevant exhibits of the form to obtain an insurer's or reinsurer's total gross income.

Section 832(c), besides allowing as deductions such usual items as interest and taxes,[5] allows the deduction of "all ordinary and necessary expenses incurred as provided in § 162 (relating to trade or business expenses)" and of "losses incurred as defined in subsection (b)(5) of this section". These provisions, in combination with definitions of "expenses incurred" and "losses" supplied by § 832(b), work out to allow GIIC to deduct the 20% of Universale's expenses and losses allocable to it, as well as expenses it has itself incurred in conducting its business.[6]

In its tax returns for each of the years at issue, GIIC has not filled in the spaces for gross income, deductions from gross in-

---

**4.** Such a list is referred to in the treaty and by GIIC as a bordereau or borderaux.

**5.** The subsections of § 832(c) which allow these deductions are cross-referenced to the I.R.C. provisions generally allowing such deductions. For example, § 832(c)(2) allows deduction of interest "as provided in § 163", and § 832(c)(3) allows deduction of taxes "as provided in § 164".

**6.** I.R.C. § 162, which explicitly limits the deduction of any expenses by GIIC, allows deductions for ordinary and necessary expenses paid or

incurred in the conduct of a trade or business. In this context, then, § 162 would prevent GIIC from deducting extraordinary or unnecessary expenses, expenses not yet actually paid or incurred, or expenses unrelated to its trade or business.

See, e.g., *Western Casualty & Surety Co. v. Commissioner,* 571 F.2d 514, 517 (10th Cir.1978) (insurance company not allowed under principles of § 162 to take certain deductions allowed by NAIC form for commissions not yet paid).

come, or any other items which are listed above taxable income and which serve as the basis for calculating taxable income. Instead, GIIC has written, across all of those lines, "See Copy of Annual Report to Insurance Dept. of Delaware Attached Hereto." App. at 440, 473, 517. Presumably, GIIC did this because it did not in those years receive any income not reflected in the relevant exhibits on the NAIC form, and because the NAIC forms it completed contained figures for the losses and expenses passed on by Universale to GIIC plus all the allowable deductible expenses GIIC itself incurred. Despite GIIC's failure to fill in the relevant lines of its tax return, the fact is that it included in its deductions from its gross income the 20% of Universale's losses and expenses allocated to it. The Tax Court found that:

> Petitioner's obligation as a U.S. taxpayer was to report the activities relating to its reinsurance treaty with Universale in the same manner as it was required to report the same to the insurance regulatory authorities, i.e., on the basis of an annual statement approved by the National Association of Insurance Commissioners. Sec. 1.832–4(a)(1) and (2), Income Tax Regs. It appears that petitioner, in its report to the regulatory agency of the State of Delaware, was required to report, and in fact did report, its share of the premiums, losses and expenses of the reinsurance business of Universale covered by the treaty.

Memorandum sur order, App. at 416–17.

The IRS, while accepting the figure supplied by GIIC for its 20% share of Universale's gross income, has disallowed the deduction by GIIC of the 20% of losses and expenses allocated by Universale to GIIC's share of the gross, on the grounds that GIIC has not substantiated the deductibility of those losses and expenses as ordinary and necessary, made for the purposes claimed, and allocable in fact to GIIC's 20% share rather than Universale's 80% share. The IRS has also challenged whether the deductions were allocated to the appropriate tax year. This disallowance puts GIIC's tax deficiency, according to the IRS, at $1,439,676 for 1976, $1,917,174 for 1977,

and $2,503,934 for 1978. The loss carrybacks from 1976 are also challenged, resulting in a claimed deficiency of $885 for 1973 and $2,043 for 1974. GIIC filed this suit petitioning for a redetermination of its tax liability.

The situation is complicated by the uncommunicative Mr. Robert Gerling. Gerling founded GIIC in 1951 and has always been its president, as well as a director and stockholder. Until June of 1973, Gerling was GIIC's sole stockholder. In 1976, however, Gerling owned only 10.82% of GIIC's stock. At that time, the rest of GIIC's stock was held by Eden Corporation, a Swiss company, which owned 52.3%, and four individuals, each of whom owned 9.22%. In response to IRS interrogatories, GIIC claimed to be unable to discover the identities of any owners of Eden, which is no longer in existence; according to GIIC, no shareholders of GIIC, including Gerling, would answer GIIC's request for information about whether they had ever owned stock in Eden. Gerling later represented to GIIC that he has never owned any stock in Eden. From 1977 on, Gerling has owned only 8.82% of GIIC, continuing to be only a minority stockholder although remaining president and a director. Since 1977 there has been a total of eleven stockholders in GIIC, each of whom owns a little over or a little under 9% of the company. Gerling resides in Switzerland, and has done so for some time, though he remains a U.S. citizen and thus must pay U.S. tax on his worldwide income. According to GIIC, Gerling has not visited GIIC's offices since the 1950s and does not participate actively in the management of GIIC.

Gerling is Chairman of the Board of Directors of Universale, and one of its stockholders. The record does not disclose the extent of Gerling's stock ownership in Universale. GIIC reports that Universale has refused to provide information about its stockholders and has claimed that to do so would violate Swiss law.

In the Tax Court, the IRS first served interrogatories soliciting, *inter alia*, the identity of Universale's stockholders. When GIIC responded that it did not have

that information and had been unable to obtain it through reasonable inquiry, the IRS moved for sanctions under Tax Court Rule of Practice 104(c).[7] The court imposed a sanction in the form of a conclusive presumption that, from January 1, 1976 to the present, Gerling owned substantially all of the stock of Universale and, by virtue of that ownership and his position as Chairman of its Board of Directors, was in a position to cause Universale's books and records to be made available to GIIC.[8]

Around the time of the first sanction order, GIIC and the IRS negotiated at some length attempting to find a mutually acceptable procedure by which the IRS could examine the books and records of Universale in Switzerland. Universale ultimately agreed to allow a U.S. accounting firm with an office in Switzerland, selected and paid for by the IRS, to audit its books and records and supply the results to the IRS. The IRS, however, was concerned that this might constitute a violation of Article 271 of the Swiss Penal Code, which forbids, without authorization, taking action on behalf of a foreign state or foreign party within Switzerland;[9] therefore, the IRS insisted that the Swiss government be informed of the planned audit. Universale balked at this, insisting that the Swiss government not be informed, and that the audit be simply an "invitation-type" audit. At this impasse, the negotiations were abandoned and the IRS returned to its original position that the books and records of Universale must be produced in the U.S. by GIIC for IRS inspection here.

When GIIC thereafter declared that it was unable to produce Universale's books and records in the U.S.,[10] the IRS again moved for sanctions. The court, relying in

---

**7.** T.C. Rule 104(c), which is very similar to Fed. R.Civ.P. 37(b)(2), provides that:

> If a party or an officer, director, or managing agent of a party ... fails to obey an order made by the Court ... the Court may make such orders as to the failure as are just, and among others the following:
> (1) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the case in accordance with the claim of the party obtaining the order.
> (2) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence.

**8.** The first sanction order reads:

> ORDERED: ... that the following items are conclusively presumed to be true solely for the purposes of the above-docketed case:
> (1) At least from January 1, 1976 to the present and continuing, Robert Gerling owned substantially all the stock of Universale Reinsurance Company, Ltd., Zurich, Switzerland (hereinafter "Universale");
> (2) At least from January 1, 1976 to the present and continuing, by virtue of his position as Chairman of the Board of Directors and the owner of substantially all the stock of Universale, Robert Gerling was, and is, in a position to help make arrangements so as to enable petitioner to comply with respondent's request that there be made available to respondent any and all books and records which reflect the premiums, losses, expenses and other items subject to the reinsurance treaty between petitioner and Universale.
> App. at 404–05.

**9.** Art. 271 reads, in translation, as follows:

> 1. Anyone who, without authorization, takes in Switzerland for a foreign state any action which is within the powers of the public authorities,
> Anyone who takes such actions for a foreign party or for any other foreign organization,
> Anyone who facilitates such actions,
> Shall be punished with imprisonment, in serious cases with penitentiary confinement.
> App. at 599.

**10.** The IRS discovery requests in question covered the following:

> 1. Those portions of Universale Reinsurance Company, Ltd.'s ("Universale") books, and its papers, records and documents, which are relevant to, or were used in, the computation of petitioner's claimed losses paid for the years 1976, 1977, and 1978.... For purposes or identification, the items referred to are the portions of books, and the papers, records and documents, upon which Universale, and Universale's chartered accountants and certified public accountants, relied in computing Universale's total losses paid and petitioner's share of said losses paid for such years.
> 2. Those portions of Universale's books, and its papers, records and documents, which are relevant to, or were used in, the computation of petitioner's claimed underwriting expenses for the years 1976, 1977, and 1978 ....
> App. at 414–15. GIIC objected to these requests on a number of grounds, including its lack of possession, custody, or control of the requested documents, and the lack of relevance of the documents to the subject matter of the action. App. at 415.

large part on the conclusive presumption that Gerling owned Universale and was in a position to cause it to produce the books and records sought by the IRS, held that GIIC could be held responsible for their unavailability and entered a second sanction order. To justify this sanction, the court also relied on the breakdown of negotiations for access to Universale's books. It held that the IRS's "condition that the approval of the audit by the Swiss Federal Government should be obtained is not unreasonable." ¶ 87.41 P–H TC at 87–353. In reaching this holding, the court did not discuss whether Universale's objection was reasonable, or whether GIIC could be held responsible for an unreasonable objection made by Universale under circumstances in which GIIC had no legally enforceable means of overcoming the objection. Instead, the court focused solely on the reasonableness of the IRS' view that Art. 271 might apply under the circumstances.[11]

Under the terms of the second sanction order, GIIC was precluded from offering into evidence the Technical Figures, the Exercise, the publications of the Swiss Insurance Department and any other evidence derived from the books and records of Universale.[12] Given these sanctions, the grant of summary judgment for the IRS was a foregone conclusion.

In reviewing GIIC's appeal from the grant of summary judgment, we must address the issue of whether the Tax Court erred in granting the IRS's motions to compel and motions for sanctions without first finding, on the basis of the record, (1) that GIIC had the right to secure from Gerling the information as to his Universale holding, and (2) that GIIC's relationship with Universale was such that it was able to require that Universale's books and records be produced in the United States. Because the issue of whether a corporation can be held accountable for its failure to produce information and documents not within its possession, custody, or control is an issue of law, our review is plenary. *See In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 257, 265, 277 (3d Cir.1983). Given our view of the resolution of this issue, we do not reach the issue of whether the Tax Court abused its discretion in choosing the particular sanctions that it imposed.

## II.

■ We focus first on the sanction imposed on GIIC for failing to secure and provide information about Gerling's holdings in Universale. The issue here is whether the Tax Court was justified in holding GIIC accountable for the refusal of its president to supply the information requested.

The Tax Court Rule of Practice 71(b), like its model, Fed.R.Civ.P. 33, requires a party to respond to interrogatories by sup-

---

11. The court explained:

Nothing in article 271 suggests that an "invitation-type" audit ... would remove respondent's agents from the sanctions of article 271. In the second place, even if the use of an "invitation-type" audit might arguably avoid the need for the approval of the Swiss Federal Government, we do not think it is within our province to second-guess respondent on this issue.... "[T]he courts must take care not to impinge upon the prerogatives and responsibilities of the political branches of the government in the extremely sensitive and delicate area of foreign affairs." ... The fact that the alternative of producing the books and records of Universale in the United States may be expensive or cumbersome and therefore impose some hardship on petitioner and Universale does not make respondent's position unreasonable.

¶ 87.41 P–H TC at 87–353 (quoting *United States v. First Nat'l City Bank,* 396 F.2d 897, 901 (2d Cir.1968)).

12. The second sanction order reads:

ORDERED: that petitioner is hereby precluded from offering into evidence at the trial of this case any books and records of Universale which reflect the premiums, losses, expenses and other items subject to the reinsurance treaty between petitioner and Universale and/or any evidence reflecting information derived from said books and records, including but not limited to the annual statements received by petitioner from Universale (sometimes referred to as the "Exercise" and "Technical Figures,") the publications of the Swiss Insurance Department, and the deposition of Horst Kurnik [Vice President of GIIC], taken on April 18, 1984, including the accompanying exhibits.

App. at 425–26.

plying information which is in its possession or which is available to it upon reasonable inquiry. *Trane Co. v. Klutznick,* 87 F.R.D. 473, 476 (W.D.Wisc.1980) (under Rule 33 a party has a "duty to provide all information available to him ... [and] information which is controlled by a party is available to him"); *Brunswick Corp. v. Suzuki Motor Co.,* 96 F.R.D. 684, 686 (E.D. Wisc.1983) ("Rule 33 requires that a corporation furnish such information as is available from the corporation itself or from sources under its control").

In this case, the Tax Court concluded that GIIC had information concerning Gerling's ownership of Universale within its control solely because Gerling was its president and he obviously had that information. It did not expressly address the contention that this was information possessed by Gerling in his own behalf and not in his capacity as an agent for GIIC. We conclude that the Tax Court erred in holding GIIC accountable for failing to supply information concerning Gerling's holdings in Universale without first finding either that Gerling had some duty to provide this information to GIIC or that this was a situation that justified ignoring the corporate status of GIIC as an entity separate from Gerling. Unless GIIC had a legally enforceable right to secure this information from Gerling or the corporate entity of GIIC can be disregarded, it cannot be said that the information sought was within its control. Since the Tax Court did not make an affirmative finding on either of these points and, indeed, the present record would not support an affirmative finding on either of them, we must remand for further proceedings.

The Supreme Court, some time ago, addressed the subject of the duties of corporate officers and directors to provide information in their possession on behalf of their corporation, saying:

> A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt.

*Wilson v. United States,* 221 U.S. 361, 376, 31 S.Ct. 538, 543, 55 L.Ed. 771 (1911). Like almost all cases on this issue, *Wilson* dealt with a request for information that was clearly related to the corporation's business and not personal in nature. The personal letters of the corporation's president were not included among the documents demanded; had they been, the Court remarked, a requirement for production might have encountered difficulties.

Since *Wilson,* the responsibility of officers and directors of a corporation to supply to or for their employer any information obtained in the course of their employment has become well established. *See Acme Precision Products, Inc. v. American Alloys Corp.,* 422 F.2d 1395, 1398 (8th Cir.1970) (citing cases); *In re Investors Funding Corp. of New York Securities Litigation,* 523 F.Supp. 533, 540–41 (S.D.N.Y.1980) (citing cases). It has also been established that knowledge of officers and key employees of a corporation, if relevant to the subject matter of an interrogatory or production request directed to the corporation, may be imputed to the corporation itself. *See Wyle v. R.J. Reynolds Industries,* 709 F.2d 585, 590 (9th Cir.1983); *General Dynamics Corp. v. Selb Mfg. Co.,* 481 F.2d 1204, 1210–11 (8th Cir.1973), *cert. denied* 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed. 2d 116 (1974); *Matter of Pubs, Inc. of Champaign,* 618 F.2d 432, 438 (7th Cir. 1980). *See also* 4A Moore's Federal Practice, ¶ 33.26 at 33–154–56 (a corporation's answers must include facts and knowledge of its agents and any person under its control). This second principle has been qualified to exclude personal information, however. In *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 427 F.2d 862, 869 (4th Cir.1970), for example, it was held that the knowledge of an officer or director obtained while acting outside of the scope of his official duties and in connection with a matter in which he was acting for himself rather than the corpora-

tion is not to be imputed to his corporation unless the facts are such that "the 'alter ego' or instrumentality doctrine, or legal principles closely akin thereto" are applicable. And in *Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466, 1470 (S.D.N.Y.1983), it was held, in the context of a corporate asset purchase arranged between companies with interlocking directorates, that a director's knowledge could not properly be imputed to a corporation unless it had been gained within the scope of the director's activity with respect to that corporation. *See also Etshokin v. Texasgulf, Inc.*, 612 F.Supp. 1212, 1218 (D.Ill.1984) (knowledge acquired by director not acting within scope of his official duties not imputed to corporation).

In this case, the IRS does not contend that there is any record basis for ignoring the corporate entity of GIIC. Nor has it articulated any persuasive theory to support a conclusion that Gerling had some duty of disclosure enforceable by GIIC. Nothing in the record suggests that Gerling's ownership in Universale has anything to do with the business of GIIC. Indeed, the most reasonable inference on the present record is that Gerling acquired and maintains whatever interest he has in Universale as a personal investment.

■ We are mindful of the depth and breadth of the fiduciary duty owed by an officer of a Delaware corporation to his or her corporation. It well may be that, in the absence of a countervailing duty to another, such an officer has a duty to provide the corporation with any information in his or her possession having relevance to a determination of the corporation's tax liability. For present purposes we may assume that such is the case, however. Neither the IRS nor the Tax Court has suggested that the extent of Gerling's ownership in Universale is relevant to a determination of GIIC's tax liability. For both, Gerling's interest is important only to the extent that it indicates that he has control over the books and records of Universale and, accordingly, the power to have them produced in the United States. Moreover, the only provision of the Internal Revenue

Code that is mentioned in the voluminous briefing in this case and that might conceivably alter GIIC's tax liability based on its relationship to Gerling is § 482. Where two or more corporations are directly or indirectly controlled by the same interests, § 482 allows the IRS to reallocate gross income, deductions, credits or allowances between the corporations if it determines that such reallocation is necessary to prevent evasion of taxes or clearly to reflect the relative income of the corporations. Thus, if Gerling controlled both GIIC and Universale during the taxable years at issue, § 482 could conceivably be used to readjust the income and deductions allocable to each corporation. As we have noted, however, the record in this case contains nothing suggesting that Gerling was anything more than an officer and a minority stockholder of GIIC during the relevant years and, without more, cannot be said to have been in control of GIIC. Accordingly, any control Gerling may have had over Universale is irrelevant to determining GIIC's tax liability for the relevant years.

### III.

■ Turning to the sanction imposed on GIIC for failing to produce the books and records of Universale, we conclude that the Tax Court erred for closely related reasons. First, it necessarily follows from our conclusion in Section II that the Tax Court was not entitled to conclusively presume that Gerling owned substantially all of the stock of Universale. Second, the Tax Court failed to take into account the fact that any power Gerling had to control the books and records of Universale was not held for the benefit of GIIC; that power was held as an agent of Universale and nothing in the record justified the court in ignoring that fact.

■ The procedural rule governing the production of documents in this case is T.C. Rule 72(a)(1), which follows Fed.R.Civ.P. 34(a) in providing that a party may obtain from a party opponent documents and other tangible items that "are in the possession, custody or control of" that party. As a result, a party cannot be sanctioned for

failing to provide tangible items such as books and records unless the item can be said to be within its possession, custody or control.

 Because any control of Gerling over the books and records of Universale was held by him not in his personal capacity, but rather as an agent of Universale, the analysis necessary to determine whether GIIC can be held accountable for failing to produce Universale's books and records must focus on the relationship between GIIC and Universale. *Societe Internationale pour Participations Industrielles et Commerciales, S.A. v. McGranery*, 111 F.Supp. 435, 441–42 (D.D.C.1953), *aff'd sub nom. Societe Internationale v. Brownell*, 225 F.2d 532 (D.C.Cir.1955), *aff'd in part in later proceeding sub nom. Societe Internationale v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Afros S.P.A. v. Krauss–Maffei Corp.*, 113 F.R.D. 127 (D.Del.1986); *Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466 (S.D.N.Y.1983). In the absence of control by a litigating corporation over documents in the physical possession of another corporation, the litigating corporation has no duty to produce. *Societe Internationale v. McGranery, supra; Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir.1984) ("control is the test with regard to the production of documents [and] is defined not only as possession, but as the legal right to obtain the documents requested on demand"); *In re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 423 (N.D.Ill.1977) ("the test is whether the party has a legal right to control or obtain" the documents); C. Wright & A. Miller, 8 Federal Practice & Procedure § 2210 ("Control is defined ... as the legal right to obtain the documents required on demand"). The location of the documents, whether within the territorial jurisdiction of the court or not, is irrelevant. *Marc Rich & Co., A.G. v. United States*, 707 F.2d 663, 667 (2d Cir.1983), *cert. denied* 463 U.S. 1215, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983); *In re Uranium Antitrust Litigation*, 480 F.Supp. 1138, 1144 (N.D.Ill.1979).

 Where the litigating corporation is the parent of the corporation possessing the records, courts have found the requisite control where "a subsidiary corporation acts as a direct instrumentality of and in direct cooperation with its parent corporation, and where the properties and affairs of the two [were] ... inextricably confused as to a particular transaction," *Acme Precision Products, Inc. v. American Alloys Corp.*, 422 F.2d 1395, 1398 (8th Cir.1970). Even where the separate corporate entities have been observed, however, some courts have found the requisite control based on the fact that the parent had the power to elect a majority of the board of directors of the subsidiary. *E.g., In re Uranium Antitrust Litigation, supra* at 1152 (corporate parent Noranda held responsible for producing documents of wholly-owned subsidiaries but not documents of 43.8%–owned subsidiary which conducted its corporate affairs separately); *see also Hubbard v. Rubbermaid, Inc.*, 78 F.R.D. 631, 637 (D.Md.1978) (fact that wholly-owned subsidiaries were separate corporate entities was irrelevant and litigating parent had to produce documents held by its subsidiaries).

Where the litigating corporation is the subsidiary and the parent possesses the records, control has been found to exist where the "alter ego" doctrine warranted piercing the corporate veil, *e.g., In re Uranium Antitrust Litigation, supra* at 1152–53 (litigating subsidiary Rio U.S. held responsible for documents possessed by Canadian parent where evidence established that the two "operated as a single functional unit in all aspects of their uranium business" and "have shared an interlocking structure of corporate directors, officers, and executive and administrative personnel who have managed the uranium-related activities of both corporations"); *see also Advance Labor Service, Inc. v. Hartford Accident & Indemnity Co.*, 60 F.R.D. 632, 634 (D.C.Ill.1973) (veil-piercing where two corporations had identical stockholders and directors), and where the subsidiary was an agent of the parent in the transaction giving rise to the suit and in litigating the suit on the parent's behalf. An example of the latter situation is found in *Afros S.P.A. v. Krauss-Maffei Corp.*,

*supra,* where the litigating subsidiary was held to have the requisite control over documents held by the parent where the subsidiary was the exclusive seller of its parent's products in the United States. The court's reasoning was as follows:

> The relationship between KMC [the litigating subsidiary] and KMAG [the parent] is very close. In addition to being a wholly owned subsidiary, KMC's Board consists of upper echelon KMAG employees who have substantial oversight responsibility in that corporation. Key decisions regarding this litigation, primarily the assignment of patent rights and decision to counterclaim, were made by a KMAG employee with no direct connection to KMC. KMAG has provided documents at the request of KMC, demonstrating that the requested items are within KMC's reach. The intercorporate relationship balances in favor of finding that KMC has control of the requested documents.

113 F.R.D. at 132. Where the relationship is thus such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in the litigation, the courts will not permit the agent-subsidiary to deny control for purposes of discovery by an opposing party. *E.g., First National City Bank v. Internal Revenue Service,* 271 F.2d 616, 618 (2d Cir.1959) (where there is access to the documents when the need arises in the ordinary course of business, there is sufficient control when the need arises because of governmental requirements); *Cooper Industries v. British Aerospace Corporation,* 102 F.R.D. 918, 919 (S.D.N.Y.1984) (where wholly-owned defendant subsidiary was the marketer and servicer of parent's aircraft in the United States, it was found "inconceivable" that subsidiary could not obtain aircraft manuals and related documents); *Compagnie Francaise D'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 35 (S.D.N.Y.1984)

(agent organization should be required to produce documents held by its principals).

The few cases involving sister corporations under common control follow the same pattern as the cases involving a litigating subsidiary. The requisite control has been found only where the sister corporation was found to be the alter ego of the litigating entity, *e.g., Perini American, Inc. v. Paper Converting Machine Co.,* 559 F.Supp. 552, 553 (E.D.Wis.1983) ("both corporations are the 'alter ego' of Fabio Perini" [who owns 100% of one and 99.5% of the other] and "[t]o treat them as unrelated entities would defy reality"), or where the litigating corporation had acted with its sister in effecting the transaction giving rise to suit and is litigating on its behalf, *e.g., Alimenta (U.S.A.), Inc. v. Anheuser-Busch Companies,* 99 F.R.D. 309, 313 (N.D.Ga.1983) (the sisters had "acted 'as one' in the transaction at issue" and the sister possessing the documents had assisted its sibling in litigating the case). *See also Soletanche and Rodio, Inc. v. Brown and Lambrecht Earth Movers, Inc.,* 99 F.R.D. 269 (N.D.Ill.1983).

In this case, the Tax Court seems to have regarded GIIC and Universale as sister corporations under common control. It did so, however, only on the basis of an improper presumption that Gerling controlled Universale and a tacit assumption that Gerling controlled GIIC despite his minority stockholder status. Moreover, even if these corporations had been properly presumed or assumed to be under common control, there was no finding, and no record to support a finding, that their corporate entities had been disregarded by themselves or Gerling in the course of their businesses or that GIIC had acted for the benefit of Universale either in the transactions giving rise to the alleged tax liability or in conducting this litigation. In such circumstances, we conclude that there was no foundation for the Tax Court's conclusion that GIIC had sufficient control over Universale to require production of its books and records in the United States.[13]

---

**13.** The Tax Court also took the view that the arrangement between Universale and GIIC rendered Universale GIIC's agent in all its business affairs dealing with risks covered by the contract. We find no record basis for concluding

We have found no case in which the requisite control was found under similar circumstances. In the closest case of which we are aware, *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 257 (D.Del.1979), the court held that one Delaware corporation lacked the requisite control over documents in the control of a sister corporation after finding that their separate corporate existence had been respected in practice and that their respective business operations were not "intertwined." The court observed that "[s]ince Schering [the corporation possessing the documents sought, was] a separate legal entity from Plough, possibly having different legal and commercial interests at stake, its rights should not be determined *in absentia.*" 85 F.R.D. at 263. Given the record in this case, we regard GIIC's argument as considerably stronger than that advanced by Plough since common control was conceded in the *Pennwalt* case.

■ While not relied upon by the IRS, the Tax Court found some support for holding GIIC accountable for its failure to produce Universale's books and records in the contractual arrangement between the two corporations. GIIC has, under Article 8 of the contract, the right to inspect Universale's books at its office in Switzerland or to have an authorized agent make such an inspection. The obvious purpose of this provision was to permit GIIC to satisfy itself that it had been accorded its share of gain and losses from 20% of Universale's reinsurance business. We think it highly unlikely that a Swiss court would find that the parties, in reaching this agreement, contemplated an audit on Swiss soil by an agency of a foreign power. In the absence

of some reason to believe a Swiss court would have ordered such an audit on GIIC's application, we decline to make that assumption. Accordingly, we are unwilling to hold that GIIC was subject to sanction for failing to exercise its contractual right of access to Universale's books and records.

In reaching this conclusion we find no fault with the Tax Court's conclusion that the IRS was reasonable in insisting either that the Swiss government be informed of the proposed Swiss inspection or that the books and records be inspected by it in the United States. The IRS undoubtedly has the right to insist upon inspection by its own agents or an independent contractor of its own selection. But the issue is not the reasonableness of the IRS's position; the issue is whether GIIC was in a position to satisfy the reasonable demands of the IRS by virtue of Article 8 of its agreement with Universale. We conclude that it was not.

We therefore hold that the second sanction, the prohibition on use by GIIC of any of its evidence relating to the deductions passed on to it by Universale, imposed by the Tax Court on GIIC for GIIC's failure to produce Universale's books and records, was reversible error.

### IV.

Our analysis and holding in this case should not materially affect the ability of the IRS to fulfill its responsibilities. In the vast majority of cases involving the production of information or documents by reinsurers like GIIC, the reinsured will not be a foreign corporation located exclusively abroad and will be subject to the subpoena power of the IRS.[14] Moreover, even in

---

that there is an agent-principal relationship between GIIC and Universale.

**14.** Additionally, the IRS in the future may be more easily able to show that information it seeks is relevant to the tax liability of a reinsurer in GIIC's position. I.R.C. § 845, added to the Code in 1984, now gives the IRS authority to readjust the income, deductions, credits and other tax items of parties involved in reinsurance transactions having some kind of tax avoidance effect. Section 845 gives the IRS this authority both where the parties are commonly controlled and where they are unrelated. Had

§ 845 been effective during the taxable years at issue in this case, then, even if the IRS could not show common control of GIIC and Universale, the IRS would still have had legal authority to readjust GIIC's characterization of its income and deductions under the treaty if it determined that GIIC was avoiding a significant part of its tax liability by means of the reinsurance arrangement with Universale. In such a case, the relevance of information sought by the IRS would not depend on the existence of a control relationship between the reinsurers, and thus could more easily be demonstrated.

situations precisely like that presented here, the fact that the taxpayer bears the burden of proof in substantiating its deductions makes the unavailability of additional documentation far less significant than it would otherwise be. GIIC, for example, still faces the problem of how it will substantiate the deductions it has claimed. Although GIIC will no longer be precluded by sanction from using the information available to it, if its evidence is found to be inadmissible or not sufficiently probative to convince the trier of fact that all conditions necessary for a valid deduction are present, the assessed deficiency will stand.

Finally and most importantly, our analysis is necessary in order to prevent innocent parties from paying a penalty when they and their agents have no power to obtain information or documents requested in litigation. We have in mind in particular the interests of minority stockholders in a corporation involved in litigation; such stockholders should not suffer because of the inability of the corporation to produce information or documentation it does not control.

### V.

Our conclusion will not automatically absolve GIIC of any adverse consequences which may result from its inability to produce the books and records of Universale. GIIC included in the deductions it reported on its tax return its 20% share of Universale's non-life losses and expenses; GIIC was required to do so by the NAIC form and therefore by I.R.C. § 832. Unless there is good reason for disregarding the statutory requirement that GIIC calculate its taxes as it did, GIIC's obligation as a U.S. taxpayer is to substantiate these claimed deductions. In so doing, GIIC must bear the burden of proof. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933).

█ The only justification for not calculating tax under § 832 using the methods required by the NAIC form, for either the Commissioner or a taxpayer, is where the form conflicts with other sections of the Internal Revenue Code. *E.g., Western*

*Casualty & Surety Co. v. Commissioner,* 571 F.2d 514, 518 (10th Cir.1978) (insurance company could not under principles of § 162 include as deductions certain commissions not yet paid or incurred, although NAIC form would have allowed); *Commissioner v. General Reinsurance Corp.,* 190 F.2d 148, 151 (2d Cir.1951), *cert. dismissed* 342 U.S. 863, 72 S.Ct. 111, 96 L.Ed. 649 (1951), and its companion case *Commissioner v. United States Guarantee Co.,* 190 F.2d 152 (2d Cir.1951) (requiring method of timing deductions that would more closely reflect when losses were actually paid than method specified on NAIC form). In this case, GIIC argues that the accounting methods prescribed for reinsurers by the NAIC form and § 832 conflict with "fundamental principles of taxation" and with Code § 61, which is simply the definition of gross income. Appellant's Brief at 27. In GIIC's view, it cannot be subjected to tax on anything except the net amount it received from Universale because only that net amount falls within the definition of gross income. We see no conflict here. The principle to which GIIC refers, that an entity should not be taxed on income it did not receive, is true as general rule. However, taxpayers are frequently taxed on income that, although it never actually showed up in their pockets or bank balances, has nonetheless been imputed to them for one reason or another. In this case, we have a statutory requirement that GIIC use a certain method of computing its income and deductions; the fact that that method involves imputing additional income to GIIC, and allowing it to take deductions which are in part the losses and expenses of another, does not mean the statute may be ignored.

█ The caselaw fully supports this view. In the first case on the interaction of the NAIC form and the Internal Revenue Code, *Commissioner v. New Hampshire Fire Ins. Co.,* 146 F.2d 697 (1st Cir. 1945), the court required the strict use of the form developed by the NAIC's predecessor, the National Convention of Insurance Commissioners, in the face of the Commissioner's argument that the form

should be ignored as it did not truly reflect income. According to the First Circuit:

We agree with the Tax Court that Congress in enacting the statute under consideration must have intended the use of the Convention Form "as understood, followed, and applied in the insurance world." ... We concede that as a fundamental principle tax returns must truly reflect income, and that returns based exclusively on the Convention Form do not.... But there seem to us considerations that more than counterbalance this contention.

146 F.2d at 700. The counterbalancing considerations included the complexity of insurance accounting and the importance of following established practice, thus avoiding confusion and expense. *See also Fidelity & Deposit Co. of Maryland v. United States*, 50–1 U.S.T.C. ¶ 9106, *aff'd* 177 F.2d 805 (4th Cir.1949), *reh'g denied* 178 F.2d 753; *Bituminous Casualty Co. v. Commissioner*, 57 T.C. 58, 77–78, Dec. 31,031 (1971) (discussing difficulty faced by Congress in taxing insurance industry, development of special rules by NCIC/NAIC, and concluding that the I.R.C. clearly adopts basic approach of NAIC form method of computing underwriting income and that this approach should be used even though inconsistent with generally applicable tax accrual rules). We also note that in *Hanover Insurance Co. v. Commissioner*, 598 F.2d 1211, 1217 (1st Cir.1979), *cert. denied* 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979) the First Circuit held that the requirement of use of the methods of the NAIC form, as established in *New Hampshire Fire Insurance*, does not prevent the Commissioner from going behind the figures presented by a taxpayer on its NAIC form. The court said:

We must conclude that the Tax Court was correct in holding that MBI's adherence to the N.A.I.C. annual statement did not prevent the Commissioner from contesting the figures contained therein. Congress' "preference for N.A.I.C. accounting methods" ... should not be interpreted to inhibit the Commissioner's authority to enforce I.R.C. § 832. His inquiry into the validity and accuracy of the figures reported under that provision ... is a necessary step in his exercise of that authority.

598 F.2d at 1217 (quoting *Commissioner v. Standard Life & Accident Ins. Co.*, 433 U.S. 148, 161 n. 24, 97 S.Ct. 2523, 2531 n. 24, 53 L.Ed.2d 653 (1977)). Therefore, as GIIC has not presented any persuasive justification for not adhering to the statutory instruction that GIIC use the methods prescribed by the NAIC form for calculating its gross income and deductions, it is responsible for substantiating its deductions of the losses and expenses allocated to it by Universale.

## VI.

We emphasize that ours is a narrow holding based on the current record in this case. In particular, we do not foreclose the IRS from further developing the record concerning the relationships among Gerling, GIIC, and Universale. With respect to the relationship between Gerling and GIIC, this may be done through, *inter alia,* further discovery of GIIC. If the record is further developed, the Tax Court is free to reexamine the issue of whether GIIC can be held accountable for failing to provide the books and records of Universale or information about its stockholders applying the principles we have discussed in this opinion.

We further emphasize that we express no opinion on whether the Technical Figures, the Exercise, or the publications of the Swiss Insurance Department may be used by GIIC without IRS access to the underlying documents, or on whether they are admissible in evidence, or if so, on whether they are sufficiently probative to carry GIIC's burden of proof regarding its deductions.

For the foregoing reasons, we will reverse the decision of the Tax Court and remand this case for further proceedings consistent with this opinion.

SLOVITER, Circuit Judge, dissenting.

I respectfully dissent from the decision of the majority because I believe that it

creates a loophole which may be used as a shield against discovery from corporate parties. As the majority recognizes, the linchpin of the Tax Court's decision is its conclusive presumption that Gerling had sufficient control over Universale to make arrangements on behalf of GIIC to allow the IRS to review Universale's books and records.

In order to ascertain the extent of Gerling's control over Universale, the Commissioner directed interrogatories to GIIC on that issue. GIIC admitted that Gerling has been Chairman of Universale's Board of Directors from January 1, 1976 to the present and "performed the tasks normally associated" with that position. However, it failed to provide any information about the amount of Gerling's stock ownership beyond stating that he is a shareholder. The Commissioner, after additional efforts to obtain the information, sought sanctions. The Tax Court, after hearings, entered the order establishing the presumption that Gerling owned substantially all of Universale's stock. I agree with the majority that the validity of that presumption depends on whether Gerling's knowledge about his stock ownership in Universale is properly imputable to GIIC.

The majority, departing from the generally accepted principle that knowledge of the principal corporate officers is considered to be knowledge of the corporation, permits a bifurcation of a corporate officer's knowledge and requires the officer to disclose only information acquired as an agent of the corporation. Surely the majority is not suggesting that a corporation whose officers engaged in price-fixing may disclaim knowledge of those activities because they were conducted outside the authorized scope of the agent's duties for the corporation. However, because a corporation only knows what its agents know, once the bifurcation principle is accepted, it may preclude discovery of relevant facts known by those agents.

This case does not present the more troublesome question of whether a corporation may be held accountable for information known to its independent directors through other sources. Nor is this a case where a corporate officer seeks to insulate truly private and unrelated information from corporate inquiry. In the situation before us, not only is Gerling the chief executive and operating officer of GIIC, and as such owes it his undivided loyalty, but also the information requested is relevant to the interrelationship between GIIC and Universale, and hence related to the business of GIIC. In fact, the substantive issue in this case relates to the connection between GIIC and Universale, and whether that was used to shield from taxes income imputable to GIIC. I find it difficult therefore to accept the majority's view that Gerling's position as a shareholder and Board Chairman of Universale, the company that was apparently the only source of GIIC's business, did not have "anything to do with the business of GIIC." Majority at 139. For example, if Gerling knew from his position at Universale that it was underpaying GIIC on its net profits, I assume that he could not have, consistent with his duty to GIIC, failed to disclose that fact. Therefore, he had a corresponding duty to provide GIIC with the relevant information about his own stock interest in Universale. The relevant knowledge of the corporation's principal officer cannot be divorced from that of the corporation.

I fail to understand how the majority proposes that the IRS could proceed to "further develop[ ] the record concerning the relationships among Gerling, GIIC, and Universale." Majority at 144. Instead, I believe the majority's position makes further discovery on this issue fruitless. It seems to me that given GIIC's refusal to provide the information requested, the Tax Court was entitled to make the presumption that Gerling owned the majority of Universale's stock. Accordingly, I would affirm.

I note, however, that I fully agree with the majority's analysis of the relevant tax provisions and procedure set forth in Part V. of its opinion.