The accompanying Order is entered.

**CAMDEN IRON AND METAL, INC., Plaintiff,**

v.

**MARUBENI AMERICA CORPORATION, Defendant.**

Civ. A. No. 90–452(G).

United States District Court, D. New Jersey.

May 14, 1991.

---

**35.** 137 members paying $3,000 each would yield $411,000, which is more than two times the sum of $176,939.90 at issue.

Betty S. Adler, Archer & Greiner, Haddonfield, N.J., for plaintiff.

Alan S. Naar, Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein, Woodbridge, N.J., and John O'Connell, Webster & Sheffield, New York City, for defendant.

## OPINION

JEROME B. SIMANDLE, United States Magistrate Judge:

This matter has come before the court upon motion of plaintiff, Camden Iron & Metal, Inc. (Camden), for an order compelling the production of documents from the defendant, Marubeni America Corporation (MAC). The central issue presented in this motion is whether MAC exercises control over certain documents in the possession of its parent corporation, Marubeni Corporation (MC), thereby requiring MAC to produce such documents pursuant to Fed. R.Civ.P. 34(a). For reasons set forth below, the court finds that the documents are relevant and that MAC has control over the requested documents and plaintiff's motion will accordingly be granted.

### I. *Background*

Plaintiff Camden, a processor of scrap metals, filed this lawsuit against defendant MAC, a retailer of scrap metals, for breach of contract allegedly arising out of MAC's refusal to accept 36,000 tons of scrap metal. Plaintiff seeks information related to the central issue in this case, namely, documents evidencing communications between MAC, or its parent corporation MC, and Perwaja Trengganu Sdn. Bhd. (Perwaja), the ultimate prospective buyer of the 36,000 tons of scrap metal which are the subject of this lawsuit. Defendant MAC has produced all such documents in its possession, according to its attorneys, and it asserts that it lacks ability to demand similar documents from its parent, MC.

Plaintiff asserts that the documents sought are relevant to this lawsuit because said documents will confirm the true reasons for Perwaja's refusal to accept the cargo.* The documents are of particular

---

*. Camden contends Perwaja's stated reason for refusing to accept the scrap is simply a pretext because Perwaja was later able to obtain a better price for the metal after the market price dropped significantly. Further Camden avers that Perwaja may not have been able to obtain

interest to plaintiff's theory of the breach of contract in light of plaintiff's allegation that most of the negotiations with Perwaja were conducted by MC, not MAC. *Id.*

Specifically, plaintiff seeks to compel production of the following two categories of documents:

[1] Copies of all documents evidencing communications between Perwaja, Marubeni America Corporation and/or Marubeni Corporation ... includ[ing] but not limited to copies of all correspondence, memoranda, memorializations of oral communications, meetings and telephone communications, telexes, telefaxes, telegrams, etc....

[2] Copies of all correspondence, memoranda, memorializations of oral communications, meetings and telegrams, etc. regarding the manner that Perwaja was to finance the purchase of the scrap metal that is the subject of this litigation.

January 7, 1991 Letter Request for Production of Documents ¶ 1.

In reply, defendant argues that Camden has failed to show that the documents sought are (1) relevant and (2) in MAC's control. Accordingly, defendant urges that Camden's motion be denied.

The relationship between MAC and MC is of obvious importance to this motion. In general, defendant MAC is a large New York based trading company having 525 employees with branches throughout the United States, itself having 65 majority-owned subsidiaries. [Affidavit of Hideyuki Yasue, March 21, 1991 ¶ 2.] MAC is a wholly-owned subsidiary of MC, which is based in Tokyo. [*Id.* ¶ 3] MC does not exert direct control over MAC's day-to-day activities. [*Id.* ] MAC lacks ability to control the activities of MC. [*Id.* ] MAC and MC are independent trading companies to the extent that they trade for their own accounts, they book their own profits and losses, and "[m]uch, if not most, of MAC's sales volume is with entities other than Marubeni [MC]." [*Id.* ] Each company has its own officers and only one director is shared. [*Id.* ]

The transactional relationship between the parent and subsidiary in this case is not clear-cut. It was MC in Tokyo that made the initial contact with Camden Iron, on behalf of MAC, according to MAC's Shiro Hashimoto. (Dep. Tr. 75–76.) Mr. Hashimoto, who is MAC's Marketing Manager for Steel Scrap, Iron and Steel, received a request from MC in Tokyo, requesting him to purchase scrap (by MAC) for resale to MC, and for eventual sale to MC's customer, Perwaja. [Hashimoto Affidavit, March 21, 1991, ¶ 3.] MC Tokyo told Mr. Hashimoto to contact Camden Iron (Hashimoto Dep., Tr. at 75–76), but because Hashimoto was on a business trip, MC made the contact with Camden Iron directly on Hashimoto's (and MAC's) behalf. (*Id.*) Mr. Hashimoto negotiated with Camden Iron, and they allegedly reached agreement subject to inspection by Perwaja representative at Camden's facilities. [*Id.* ¶ 4.] Representatives of Perwaja and MC joined Mr. Hashimoto at the inspection in Camden. [*Id.* ¶ 5]. The deal was not consummated.

Interestingly, the profits from this transaction were to be divided between MAC and MC after the sale in an amount to be determined later. Mr. Hashimoto testified that he did not know how much that profit would be or the proportionate profit that would be apportioned between MC and MAC. (Hashimoto Dep., Tr. at 123–124.) Mr. Hashimoto acknowledged that the profit credited to his company, MAC, might be nominal or even a loss. (*Id.*, Tr. at 124, 126–127.) The indeterminate division of profits from this transaction was justified, in Mr. Hashimoto's view, because MC was MAC's "most reliable buyer" arising from their "long relationship." (*Id.*, Tr. at 123.) The profits split would depend on "mutual agreement" between MAC and MC, while Mr. Hashimoto acknowledges that if MC cannot "make enough profit, it must be patient." (*Id.*, Tr. at 123, 124.)

Mr. Hashimoto himself was an employee of MC for ten years (1979–89), when he was "assigned" to MAC in New York by the MC Tokyo general manager. [*Id.*, Tr.

adequate financing to purchase the scrap metal at issue. *See* Certification of Betty S. Adler in Support of Motion To Compel Production of Documents, ¶ 4.

at 11–12.] He expects he will most likely be transferred back to MC Tokyo in three or four years. [*Id.*, Tr. at 41.] Such transfers of employees back and forth between MAC and MC were common. [*Id.*]

## II. *Discussion*

### A. *Relevancy*

■ Under the liberal standards of discovery outlined in the Federal Rules of Civil Procedure, the court finds that the plaintiff is entitled to the information sought within the Letter Request for Production of Documents. Rule 34(a) provides in pertinent part that "[a]ny party may serve on any other party a request (1) to produce ... inspect and copy any designated documents ... which constitute or contain matters within the scope of Rule 26(b)." Fed.R.Civ.P. 34(a). The scope of discovery under the Federal Rules is quite broad. Under Rule 26 "parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Fed. R.Civ.P. 26(b)(1). Information is relevant if it "involves any matter that bears on, or that may reasonably lead to matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978).

The threshold issue here is whether Camden can establish the relevancy of the information sought. Camden seeks information related to the central issue in this lawsuit, namely, the reasons why Perwaja refused to accept the scrap metal thus causing an alleged breach of contract between Camden and MAC. As Perwaja's motives are alleged to be directly related to the potentially liable conduct in this action, plaintiff is entitled to information concerning the alleged cause of that conduct. Such information relating to Perwaja's conduct and to communications related to this transaction is therefore relevant.

### B. *Control*

The starting point of our analysis of the control issue is the language of Rule 34 itself. Rule 34(a) provides that a party may serve a request for production of documents that are "in the possession, custody or control of the party upon whom the request is served." Fed.R.Civ.P. 34(a). Although their interpretations vary, both parties agree that the critical issue in this motion is whether MAC has control over the requested documents in possession of its parent, MC, within the meaning of Rule 34.

■ This court first notes that a party seeking production of documents bears the burden of establishing the opposing party's control over those documents. *United States v. Intern. Union of Petro. & Indus. Wkrs.*, 870 F.2d 1450, 1452 (9th Cir.1989) (holding International union did not control local union because they were considered separate labor organizations under the relevant federal statutes and the contractual agreement between the labor organizations). Control is defined as the legal right, authority or ability to obtain documents upon demand. *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir.1984); *M.L.C., Inc. v. North American Philips Corp.*, 109 F.R.D. 134, 136 (S.D.N.Y.1986); *In re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 423 (N.D.Ill.1977). Thus, the determination of control in the instant case turns upon whether Camden has demonstrated that MAC has either the legal right, authority or ability to obtain these MC documents upon demand.

Federal courts construe "control" very broadly under Rule 34. *Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D.Conn.1989). For example, courts have held that a litigating parent corporation has control over documents in the physical possession of its subsidiary corporation where the subsidiary is wholly owned or controlled by the parent. *Gerling Intern. Ins. Co. v. C.I.R.*, 839 F.2d 131, 140 (3d Cir.1988) (citations omitted).

Conversely, where the litigating corporation is the subsidiary and the parent possesses the records, courts have found control to exist on the following alternate grounds:

(1) the alter ego doctrine which warranted "piercing the corporate veil";

(2) the subsidiary was an agent of the parent in the transaction giving rise to the lawsuit;

(3) The relationship is such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in litigation;

(4) There is access to documents when the need arises in the ordinary course of business; and

(5) subsidiary was marketer and servicer of parent's product (aircraft) in the United States.

*Gerling*, 839 F.2d at 140–141.

■ Hence, in parent/subsidiary situations, the determination of control turns upon whether the intracorporate relationship establishes some legal right, authority *or* ability to obtain the requested documents on demand. Evidence considered by the courts includes the degree of ownership and control exercised by the parent over the subsidiary, a showing that the two entities operated as one, demonstrated access to documents in the ordinary course of business, and an agency relationship. *Id.*

■ MAC argues that there is no showing that it exercises the requisite control over the documents at issue here. In particular, MAC relies on *Gerling* to assert that the control inquiry should turn on whether MAC and MC exhibit a thoroughly unified corporate structure. *See* Defendant's Memorandum in Opposition to Plaintiff's Motion at 8–9.

Although defendant's argument has some force, it is insufficient under the facts of this case to warrant denial of this motion. Indeed, the *Gerling* court did reverse the sanctions on an order for production by a litigating corporation of documents possessed by its president in his capacity as a major shareholder of an allegedly affiliated company. *Id.* at 133. *Gerling* is, in part, distinguishable from the case at bar because the lower court failed to address whether the information sought was possessed by the president in his own behalf in his personal capacity, rather than in his capacity as an agent for the litigating cor-

poration. *Id.* at 138. Thus, the Court of Appeals was reluctant to sustain a penalty where the relationship upon which liability derived was unclear. The court in *Gerling* emphasized that its holding was narrowly based on the information in the record before it. The court also stated that its decision did not foreclose the IRS from further developing the record concerning the relationships. *Id.* at 144. The court also stated that if the record was further developed, the lower court was free to reexamine the issue of whether the litigating corporation had requisite control. *Id.*

An additional distinction exists between this case and *Gerling*. *Gerling* examined control in the context of a relationship between a litigating corporation and its president, rather than the relationship between a litigating subsidiary and its parent corporation. Consequently possible control in *Gerling* was restricted to two theories: (1) the legal duty of an officer/director to disclose information because the information was gained within the scope of the officer/director's activity within the corporation; or (2) the situation justifies ignoring the corporate status of the litigating corporation. *Id.* at 138–39. The Third Circuit in *Gerling* surmised that the lower court's decision rested upon the second theory, and that the lower court regarded the affiliated companies as sister corporations under the common control of the president. *Id.* at 141. The Court of Appeals then noted that where the relationship is that of sister corporations, requisite control has only been found on alter ego grounds. *Id.* The relationship asserted in the present case is that of parent/subsidiary, which was not considered in *Gerling*.

MAC and MC are not corporate alter egos, because they have apparently maintained separate corporate formalities such as officers, directors, books of account and non-exclusive business dealings. But Rule 34(a) does not require plaintiff to demonstrate an alter ego relationship in order to show that a litigant "controls" documents or things that are possessed by a parent corporation with respect to a specific transaction involving parent and subsidiary.

Moving past the alter ego argument, the inquiry becomes whether control can be established on any of the other grounds for litigating subsidiary/parent situations as outlined in the *Gerling* decision. The most applicable cases are those holding that a company's ability to demand and have access to documents in the normal course of business gives rise to the presumption that such documents are in the litigating corporation's control. *See e.g., Cooper Industries, Inc. v. British Aerospace*, 102 F.R.D. 918, 919–20 (S.D.N.Y.1984). In *Cooper* the court ordered a litigating subsidiary to produce documents of its British parent corporation even though the parent was not a party to the litigation. The parent was the manufacturer of the planes which were the subject of the lawsuit. The defendant was wholly-owned by the British parent and was the distributor and servicer in the United States of the parent's aircraft. In granting the motion to compel production, the court noted that "the documents plaintiff seeks all relate to the planes that defendants work with everyday" thus "it is inconceivable that defendant would not have access to these documents and the ability to obtain them for its usual business." *Id.* at 919–20. Applying this reasoning, MAC's contention that this case is factually distinguishable from *Cooper* because the litigating subsidiary in *Cooper* served as the sole distributor and servicer of the parent's product is without merit. The proper inquiry here is whether the documents sought are considered records which MAC is apt to request and obtain in its normal course of business.

The court finds that the instant case is analogous to the facts in *Cooper*. Like *Cooper*, the documents sought by the plaintiff relate to a transaction that the defendant worked on, namely the negotiations for the sale of scrap metal to Perwaja. The evidence is unrefuted that MAC's parent MC made the initial contact with plaintiff concerning this transaction, *see* FAX dated July 13, 1989, Exhibit 3 to Affidavit of Adler in support of motion (Adler Affidavit). Further, MC directed MAC's Hashimoto to negotiate with Camden, and when Hashimoto was initially unable to do so, MC made direct contact to Camden. In this respect MC can be viewed as engineering the deal in much the same way as British Aerospace produced the aircraft. Like the Cooper defendant, MAC is also wholly owned by its foreign parent.

Moreover, plaintiff proffers unrefuted evidence that MC played a significant role in the transaction through its continued participation in the negotiation process, *see e.g.* Exhibit G ¶ 1, Adler Affidavit (memorandum confirming top management in Kuala Lumpar involved in hard negotiations); Exhibit E, Adler Affidavit (confirming MC's presence on inspection visit team). In fact, the undisputed record before the court demonstrates that at all times the deal being negotiated by MAC was subject to MC's final approval before there could be a consummation of the shipping agreement. Furthermore, the plaintiff has also proffered evidence that MAC has in the normal course of business obtained documents from MC related to this transaction. *See* Adler Affidavit ¶ 11; Exhibit G Adler Affidavit. Further, the indeterminate division of profits between MAC and MC on this deal, to be determined at a later date, in which MAC's "negotiator" would be a former MC employee, who was "transferred" to MAC for these purposes and who is expected to be "transferred" back to MC in the future, suggests further that MC and MAC acted in this transaction "as one." In his reply brief, MAC's counsel John J. O'Connell, Esquire indicates that he "has never discussed any aspect of this litigation, let alone with prospective trial testimony, with any person from Marubeni." Reply Brief, pg. 2. This statement also suggests that Mr. O'Connell never made even an informal request for the Marubeni documents at issue, which greatly undermines his claim that he is unable to obtain the documents now requested by plaintiff. The "inability" of MAC's counsel is at best theoretical, not demonstrated. The facts of this case support a finding that defendant MAC has easy and customary access to the MC documents involving this transaction, and MAC possesses the ability to obtain such documents from MC

for its usual business needs. One such business need is to provide highly relevant documents in litigation.

Plaintiff has met its burden of showing sufficient "control" by MAC concerning these documents. This court finds that the documents sought are within the "control" of MAC for purposes of Rule 34(a) and must be obtained and produced by MAC in this litigation.

### Conclusion

For the foregoing reasons, plaintiff's motion for production of documents will be granted. Defendant Marubeni America Corporation will be compelled to obtain and produce the documents to which plaintiff is now entitled within twenty (20) days.